# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
January 7, 2003 Session

## STATE OF TENNESSEE v. ANDERSON TOLIVER

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Hamilton County**
**Nos. 223083 and 223085      Stephen M. Bevil, Judge**

_____

### No. E2001-00584-SC-R11-CD - Filed October 2, 2003

_____

The defendant was convicted of two counts of aggravated child abuse. The trial court imposed a nine-year sentence for each conviction and ordered concurrent service of these sentences. The defendant appealed, raising numerous issues, but the Court of Criminal Appeals affirmed the convictions and sentences. We granted the defendant's application for permission to appeal and, after thoroughly reviewing the record, conclude that the trial court abused its discretion in consolidating the two indictments for trial. Furthermore, we have concluded that the erroneous consolidation of the indictments, in conjunction with the erroneous admission of evidence of other crimes, wrongs, or acts, affirmatively appears to have affected the verdict of the jury. Accordingly, the judgments of the trial court and Court of Criminal Appeals are reversed, and these cases are remanded for new trials at which evidence of other crimes, wrongs, or acts committed by the defendant against the victim or others shall not be admitted unless relevant to a material issue.

### Tenn. R. App. P. 11; Reversed and Remanded for New Trials

FRANK F. DROWOTA, III, C.J., delivered the opinion of the court, in which JANICE M. HOLDER, and WILLIAM M. BARKER, JJ., joined.

ADOLPHO A. BIRCH, JR., J., filed a concurring opinion.

E. RILEY ANDERSON, J., filed a dissenting opinion.

Jerry H. Summers and Thomas Greenholtz, Chattanooga, Tennessee, for the appellant, Anderson Toliver.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Angele M. Gregory, Assistant Attorney General; William H. Cox, III, District Attorney General; and Kelli Black, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

The defendant, Anderson Toliver, was convicted of two counts of aggravated child abuse for striking his stepson, G.S., on March 1, 1998 and April 9, 1998, with a braided heavy-duty extension cord.[1] G.S., who was eighteen years old and a senior in high school at the time of the trial and sixteen years old when the alleged incidents occurred, testified as the State's first witness. Before being asked about either of the incidents alleged in the indictments, G.S. was questioned about earlier incidents of abuse and said that from the time he was in eighth grade the defendant would regularly whip him and his younger brother whenever they received a grade lower than a "B." He testified that these "beatings" occurred at least every six weeks, when report cards were issued. G.S. said that the defendant initially used a weight belt, described as a wide belt worn by persons for back support while lifting weights, that the defendant then progressed to a braided telephone cord, and that the defendant then began using a braided extension cord which sometimes had a wire woven into the braid and duct tape wrapped around the wire. According to G.S., the defendant would administer this punishment in the boys' bedroom. The defendant would require the boys to bend over and would then strike them "on the back or the butt" while they were fully clothed or in their underwear. G.S. said that the pain from these incidents would last "sometimes weeks, sometimes days" and when asked what he did for the pain, G.S. responded that he would "ignore it."

The victim then was asked about the incident on March 1, 1998,[2] which was the basis for the first indictment charging the defendant with aggravated child abuse. G.S. said that he had just received "some low grades" and described what happened when he returned home:

> It always started as like I would have to bend over and then he hit me with the extension cord, and this time it had coat hangers braided around it and then the extension cord and duct tape at the end. And I would fall, and if I fell, he'd hit me on my back until I had to get up.
>
> Q. What did it feel like when he was hitting you with the extension cord?

---

[1]There were two defendants at the trial, the defendant, Anderson Toliver, the victim's stepfather, and Annie Toliver, the defendant's wife and the victim's natural mother ("Mrs. Toliver"). Mrs. Toliver was convicted of a lesser offense and did not appeal the conviction. Therefore, the references in this opinion to the "defendant" are to Anderson Toliver.

[2]The victim's testimony on direct examination as to the March 1 incident consists of two pages in the trial transcript, while his detailing of the April 9 incident consists of approximately nineteen pages.

A. At first it was like – the first contact it would be like a real pain, numbness, and then increase. Like at first I couldn't feel anything and then it was just like all coming in together and it hurt real bad.

G.S. then described in much greater detail the April 9, 1998, incident,[3] saying that while he was in his room, the defendant came in, forced him to bend over, and hit him twice with the braided extension cord, this time without the added coat hangers and duct tape. When he then stood up and refused to bend over again, the defendant grabbed his neck and tried unsuccessfully to force him to bend over. The defendant then began punching and choking G.S. with his hands, then gave the braided extension cord to the victim's mother, and then began choking G.S. again. The victim said that he was in "lots of pain," that his "neck was hurting," and that his throat was "hurting real bad." After this, G.S. fell to the floor, and the defendant retrieved the braided cord from the victim's mother and began swinging it again. When the victim grabbed at the cord, the defendant wrapped it around his neck and began lifting him from the floor and slinging him around the room. G.S. fell against the handlebars of some bicycles and the wooden bunk bed in the room. G.S. then fell to the floor, but, before losing consciousness for a couple of seconds, the victim heard his mother call the defendant's name. At this point the defendant released the extension cord and left the bedroom. The victim caught his breath, ran to a neighbor's apartment, and called the police. G.S. described his condition when he arrived at his neighbor's house:

I wasn't really feeling any pain, I guess it was trembling. I was just crying. I remember crying a lot. And then when the police got there, that's when it started hurting, like I noticed I had a real bad scar on my eye, real bad. I don't know how it got there, I just know my eye was like a cherry. And my throat was hurting real bad. I had like scratch marks on my neck, things like that. My ribs were hurting, because I hurt my ribs before playing football. I hit the same rib that I had hurt when I hit the bicycles.

The victim's twelve-year-old half brother, J.N., testified that he had been removed from his home with his mother and the defendant and was living at the Tennessee Baptist Children's Home at the time of trial. He acknowledged that the defendant had whipped him and the victim with a belt and with an extension cord which was wrapped around itself. He said that the defendant made them empty their pockets before the whippings to make sure they did not have any padding, and made them bend over and stretch out their hands. He said that the defendant had whipped him "hard" with the extension cord "like maybe three times," but that he "got smart" and "learned [his] lesson." When asked about the victim, J.N. said he did not think that G.S. had learned his lesson "because he repeatedly got it."

---

[3]The indictment for this incident charged both defendants with aggravated child abuse.

−3−

J.N. further testified that the whippings hurt "pretty bad" for a few days. However, in a prior statement given to a detective at the Red Bank Police Department, J.N. had said that "after being punished in this manner, the bruises and whelps [sic] lasted about three weeks" and that he "could not sit without a cushion of some sort for about four days." J.N. said that he did not consider these whippings to be beatings and that he believed he deserved the whippings the defendant had given him. J.N. also testified that the victim had "a problem telling the truth sometimes." When asked to explain, J.N. said the victim had tried to change his grades on his report card once "because he knew he was going to be in trouble for the grades" and that the victim "was always lying about something. . . ."

J.N. identified the extension cord admitted into evidence and said that it looked exactly as he remembered it and that he had never seen anything added to it. The prosecutor then asked J.N. to recite from a prior statement, where he had said that the "extension cord was usually wrapped with three pieces of coat hanger, one on each end and one in the middle" and that the "pieces of coat hanger was [sic] then wrapped with duct tape."

J.N. was at home on the night of April 9, 1998, but he did not see the incident between the victim and the defendant, although he heard them scuffling. J.N. said that he went into the victim's room to get a knife from the victim and that he "guess[ed]" the victim had intended to kill the defendant with it.

Officer Kim Cofer of the Red Bank Police Department testified that she responded to a runaway call from the victim's mother, Mrs. Toliver, on Saturday, April 4, 1998. Mrs. Toliver told Officer Cofer that G.S. had run away before and that she thought he was at his grandmother's house. Mrs. Toliver called Officer Cofer the following Tuesday, April 7, 1998, and told her she had obtained an attachment through juvenile court for the victim as an unruly runaway. Officer Cofer then went to the victim's school and took him into custody. While en route to the juvenile detention unit, G.S. told Officer Cofer that he had run away because "he was tired of being beaten like a freegin [sic] slave." The victim told Officer Cofer that the defendant whipped him with an extension cord when he did not make good grades in school.

Officer Cofer further testified regarding the statements that the victim gave to police on April 10, 1998. G.S. said that he had been beaten with a "braided cord," thrown against a wall, and punched with the defendant's fist. She said that the victim had bruising on his right eye and marks on his neck. Cofer identified three photographs showing injuries to the victim's right eye and cheek area, throat, and neck area.

Officer Jonathan Chambers, who had been with the Red Bank Police Department at the time of the investigation, testified that on April 9, 1998, he responded to a domestic violence call and spoke with the victim at a neighbor's apartment. The victim was crying and very upset and said that his stepdad beat him. Officer Chambers described his right eye as very swollen and bleeding and said that G.S. had three claw marks on his neck.

–4–

Officer Chambers also went to the Tolivers' apartment, where he spoke with the defendant and Mrs. Toliver. Both the defendant and Mrs. Toliver knew why he was there and were able to calmly speak to him about what had happened, although the defendant appeared "kind of upset." The defendant told Officer Chambers that he was gone a lot on work-related travel, that G.S. had run away and had some problems with his grades while he was gone, and that he had told G.S. to expect "a whipping" when the defendant arrived home. When the defendant arrived home he told G.S. to get ready for his whipping. When G.S. emptied his pockets he had a knife in his hand. The defendant took the knife and then hit G.S. once with the extension cord and then the victim turned around and refused to bend over, at which point the defendant said he grabbed G.S. by the throat and pushed him against the wall.

Officer Timothy Thompson, of the Red Bank Police Department, also responded to the domestic violence call on April 9. He stayed with the victim while other officers spoke with the Tolivers. Officer Thompson later spoke with Mrs. Toliver, having returned to the Tolivers' apartment at the request of a detective to retrieve the electrical cord. Officer Thompson related his conversation with Mrs. Toliver as follows:

> She stated that the disciplinary actions took place upon the outcome of their report cards: If they got goods [sic] grades, there was no problem; if they had a bad report card, they were punished. The action taken was punishment with an extension cord that was entwined and then it was tied on both ends and in the middle with a piece of coat hanger and duct tape wrapped around each strands [sic] of the coat hanger. At which time, as the disciplining began, the victims were advised to bend over, at which time they were struck in the buttocks with this extension cord.

Detective Sergeant Jim Kyle of the Red Bank Police Department spoke with the defendant in the booking room of the police station on April 9, 1998. The defendant, who Detective Kyle described as "very calm, considering he had been arrested," said that he had been disciplining the victim with an extension cord when the victim got injured. Regarding the manner of discipline the defendant told Detective Kyle, "I have them bend over and stretch there [sic] arms out and tighten up their muscles and then I strike them in the buttocks area." The defendant also told Detective Kyle, "That's legal, I have a right to do that."

The following day, April 10, 1998, Detective Kyle requested the victim and his grandmother to come to the police station to give statements. Photographs were taken of the victim's injuries as well. Detective Kyle said that the victim was "fairly quiet, like someone who had just been beat down, he was just very quiet and withdrawn."

Mark Davis lived in the apartment above the Tolivers' apartment and also attended the same church as the Tolivers. He said that the defendant had a "good" reputation. Davis further

testified that the victim came to his apartment, "scratched up and somewhat out of breath, pretty emotional," on April 9, 1998. The victim asked to use his telephone and called the police. He said that the victim had a "gash" in his head and a "scratch on his neck [that] looked like a fingernail . . . had struck him."

Wanda Davis, the wife of Mark Davis, testified that when the victim came to their apartment, he was "very distraught, crying, sweating, and had an injury to his face, his neck." Mrs. Davis asked the victim if the defendant had "punch[ed]" him because she knew that the victim and the defendant did not get along, but the victim told her he had hit his head on the bed. Mrs. Davis said she put an ice pack on the victim's head and some ointment on his neck.

Mrs. Toliver testified that she married the defendant in June of 1995, when the victim was thirteen years old. She described the victim as "very smart," "very capable," and "very talented." She said that the victim had acted "indifferent" toward the defendant after their marriage and that the victim had never told her about his feelings toward the defendant. Mrs. Toliver said that upon their marriage she and the defendant had agreed that the defendant would be the parent responsible for administering discipline to her children. During the whippings, which she said occurred every four or five months, the defendant would hit the victim, "two to three times on the butt."

Mrs. Toliver testified that she had two previous interactions with juvenile court regarding the victim, the first being in 1996 when the victim stole a shirt from Sears, and the second being when he ran away on April 3, 1998. Regarding the runaway incident, Mrs. Toliver said that the victim did not bring his report card home on March 27, 1998, when it was issued, and that he had been skipping classes. On April 1, 1998, she went to the victim's school and obtained a copy of his report card and then grounded the victim and removed him from the school's track team of which he was a member. On Friday, April 3, 1998, the victim did not come home from school, so she filed a missing person's report the next day with the Red Bank Police Department. The following Monday, April 6, 1998, Mrs. Toliver went to the juvenile court and filed a runaway attachment on the victim. She said that the victim was taken into custody on Tuesday, April 7, 1998, and she picked him up from the juvenile detention facility later that same evening.

Mrs. Toliver said that on the evening of April 9, 1998, the defendant went into the victim's room to discipline him. She said that she "kind of stood in the doorway," of the victim's room, and the defendant handed her a knife he had taken from the victim. She gave the knife to J.N. and told him to put it in the kitchen. The defendant asked the victim to bend over a barrel, which she described as a "big plastic tub . . . maybe 10 or 20-gallon tub," and then hit the victim with the extension cord. The victim stood up and "came" at the defendant. The defendant handed her the extension cord and then pushed the victim back and subdued him on the floor. She said the victim "kind of calmed down and quit tussling with [the defendant]." The defendant then told the victim to get up and bend over again, and the victim complied. The defendant hit the victim again with the extension cord, and the victim "came" at the defendant

−6−

again. The two began "tussling" again, and Mrs. Toliver said she screamed at them to stop fighting. Mrs. Toliver testified that the defendant then backed off and walked out of the room. The victim was breathing "kind of hard" and ran out of the room and went to the Davises' apartment.

Mrs. Toliver said that she never saw the defendant hit the victim in the face and did not see the victim hit the defendant, although she did see the victim make a gesture toward the defendant. Mrs. Toliver did not know how the victim got hurt, but speculated that he could have hit his head on some of the furniture in the room.

Mrs. Toliver acknowledged asking police when they arrived to arrest the defendant, "Why are you taking Anderson in, why not take both of them in, they were both fighting." She also acknowledged telling the police officer who later came to her apartment to retrieve the extension cord that it normally had "coat hanger wire wrapped around it to hold it steady" and had "duck tape wrapped around the wire so that the wire wouldn't be exposed."

William Russell, testifying as a character witness for Mrs. Toliver, said that he had attended the same church as Mrs. Toliver prior to her marriage to the defendant. He had also sold a car to the Tolivers. Russell said that he felt like he knew the defendant "very well," that the defendant's reputation in the community was "excellent," and that he knew Mrs. Toliver's "children well enough to know that if they were being beat [sic], they would tell [him]."

Grace Hughley testified that the defendant had a good general character reputation in the community, that his reputation for telling the truth was good, and that she would believe his testimony under oath.

Also testifying on behalf of the defendant was Douglas Daugherty, president of Chattanooga Resource Foundation, who said that he first met the defendant in 1993, when the defendant was selected to participate in a leadership development program through the Foundation. Daugherty stated that he knew the defendant "fairly well," that his reputation was "excellent," and that he would believe him under oath in a court of law.

Melvin Benford testified that he had known and attended church with the Tolivers for seven years. He said that the defendant's reputation was "good" and that he had never seen the defendant beat the victim.

Aqua Peoples, a teacher at Ringgold Middle School, testified that she had known and attended church with the Tolivers. She said that the defendant's reputation was "very good" and that she would believe him under oath in a court of law. She knew that the defendant believed in disciplining the children, but he had not told her how he went about doing so.

Tom Weathers, a teacher and football coach at Red Bank High School, testified that the victim was a member of the football team during the 1997 season. He related three infractions involving the victim at school and said that the victim was not truthful when questioned about the first incident. After the third incident, during which the victim had spoken to Weathers "in a distasteful way" and Weathers told the victim to get his attitude "straight," the victim stopped playing football. Weathers said he had no problems with the victim after that.

The defendant testified that, at the time of the trial, he was fifty-one years old and had children from a previous marriage. He was self-employed as a photographer, the owner of a vending machine business, and the seller of health products. As the result of these occupations, he traveled a great deal, always by automobile. He met the victim's mother in 1993, at a gospel record store, and they were married two years later. After their marriage, he moved into the apartment with Mrs. Toliver and her sons. Because of a change in jobs, he began traveling in 1997, apparently when he and his wife began their business. From the time of their marriage to his last contact with the victim, just after the April 9 incident, the defendant said he had "whipped" the victim "about twice." A more common punishment, according to the defendant, was to "ground" the victim to his room. Although it was possible that he had whipped the victim during the six months prior to April 9, the last time that he recalled doing so was in 1996, when the victim stole a shirt from Sears. The defendant denied whipping the victim on March 1 and said that he had been in Mississippi on business on that date. The defendant said that during the prior three years, he had whipped the victim's brother, J.N., "probably twice."

As for the April 9 incident, the defendant explained that he had been out of town that week and had asked his wife if the victim had brought home his report card. Learning that he had not, the defendant and his wife discussed that she should go to the victim's school to get it. He said that he arrived back in Chattanooga the morning of April 9 and, after attending to some business, arrived home at about 4:30 p.m. Both of his stepsons were home, and, after he had picked up his wife at work, they arrived back at the apartment at about 6:00 p.m. He said that, when he and his wife discussed in the early evening what to do, he was tired and did not want to deal with the victim. After some additional discussion, he told his wife that he had "promised [G.S.] that if he didn't bring those grades up on the last report card, we're going to deal with that." He said that, in view of the unsatisfactory report card, as well as a fake report card the victim had given them, "I'm left with no choice, I have to carry it out. And that's exactly what I did."

The defendant said that he walked into the victim's room and asked him to empty his pockets. The victim then pulled a "small, straight [kitchen] knife" from his pocket, and said, "in a very angry tone," and with a frown on his face, that he was going to kill the defendant with it. The victim did not resist, however, as the defendant took the knife from his hand. The defendant then went to another room, got the braided cord, and returned to the victim's bedroom, instructing him to "bend over." The defendant struck the victim once with the cord, "moderate,

−8−

nothing hard," but did not believe that the blow "stung" because the defendant "didn't really apply a lot of pressure."

The victim then stood up and grabbed the defendant by the collar, something the victim had never done before. The defendant reacted by grabbing the victim by the collar and pushing him against the bed, against the wall, and then pulling him to the floor "to subdue him." The victim complied as the defendant told him to bend over again. The defendant asked Mrs. Toliver to hand him the braided cord, and, after she had done so, he hit the victim with it again.

The victim then stood up again and raised his fists, approaching the defendant in a "fighting stance." The defendant first asked, "Do you want to fight me . . .?" After his wife called his name, however, he instructed G.S. to "just stay in the room, we'll talk about this later." He denied putting the cord around the victim's neck, and said that his fingernails caused the "claw marks" on the victim's neck. He speculated that the injuries to the victim's face might have occurred when, during the struggle, the victim hit the dresser.

During cross-examination, when asked about previously whipping the victim, the defendant testified that he had once whipped him with a belt. He denied that he had braided the extension cord, saying that "[t]he cord was already there, it's not one I bought." He said that he had used "maybe twice" the braided cord with only one coat hanger wrapped around it, and held in place with duct tape, not three coat hangers. Both of these incidents preceded that of April 9, as did his use of a belt to whip the victim.

Based upon this evidence, the jury found the defendant guilty of both counts of aggravated child abuse, and the trial court later imposed a nine-year sentence for each conviction and ordered that these sentences be served concurrently. The Court of Criminal Appeals affirmed the trial court's judgment. We granted the defendant's application for permission to appeal.

## II. Sufficiency of the Evidence

The defendant initially contends that the evidence is insufficient to support the jury's verdict. The proper inquiry for an appellate court reviewing a challenge to the sufficiency of the evidence is whether, considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed.2d 560 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999). The prosecution is entitled to the strongest legitimate view of the evidence in the record, as well as all reasonable and legitimate inferences which may be drawn therefrom. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Id. Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the

evidence are resolved by the trier of fact, and this Court does not re-weigh or re-evaluate the evidence. Id. Nor may this Court substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. See State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956).

With these principles in mind we must determine whether the evidence in this record is sufficient to support the jury's verdict. We begin with the definition of the conviction offense. The offense of child abuse is committed when a person "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." Tenn. Code Ann. § 39-15-401 (1997 & Supp. 2002). The offense of aggravated child abuse is committed when (1) the act of child abuse results in "serious bodily injury" to the child or (2) the act of child abuse is accomplished with a "deadly weapon." Tenn. Code Ann. § 39-13-402(a) (1997). A "deadly weapon" is defined as:

> (A) A firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury; or (B) Anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.

Tenn. Code Ann. § 39-11-106(5) (1997) (emphasis added). "Serious bodily injury" is defined as injury involving:

> (A) A substantial risk of death; (B) protracted unconsciousness; (C) extreme physical pain; (D) protracted or obvious disfigurement; or (E) protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty.

Tenn. Code Ann. § 39-11-106(34) (1997) (emphasis added).

As to the March 1 incident, the defendant was charged with and convicted of aggravated child abuse by use of a deadly weapon. The victim testified that the defendant struck him on the buttocks with a heavy-duty extension cord wrapped with coat hangers and duct tape. The victim stated that the extension cord was braided several times to increase its thickness. The victim testified that the beating initially felt like "real pain," and that the pain then increased. The victim further explained that the pain "hurt real bad" after a period of numbness. Viewing this evidence in the light most favorable to the prosecution, as we are required to do, we conclude that the evidence is sufficient to support this conviction.

The defendant also was charged with and convicted of aggravated child abuse by use of a deadly weapon as a result of the April 9 incident. The victim testified that the defendant struck him twice with the braided extension cord, wrapped the cord around his neck, then began slinging him around the room, causing the victim to strike objects and furniture in the room and

−10−

to sustain injuries to his ribs, neck, and face. Several witnesses corroborated the victim's testimony regarding injuries to his face and neck, and the prosecution introduced photographs of these injuries at trial. Again considering the proof in the light most favorable to the State, the evidence is sufficient to support the jury's verdict finding the defendant guilty of aggravated child abuse for the April 9 incident.

### III.  Consolidation of Indictments

Having concluded that the defendant is not entitled to a judgment of acquittal as a matter of law, we next consider whether the trial court erred in permitting the prosecution to consolidate the indictments for trial.

The prosecution obtained separate indictments for the incidents that occurred on March 1 and April 9, 1998.  On the morning of trial, the State moved to dismiss several aggravated assault charges against the defendant.  When the motion was granted, defense counsel asked the trial court "to proceed on the April 9 incident . . . and not the March 1 incident" because they were "two separate offenses that [were] six weeks apart . . . ."  The State then orally moved to consolidate the charges, stating that the parties had been "under the understanding that we were trying these cases together . . . and at no time was it ever brought up that they would be tried separately."  The State argued that consolidation was appropriate based on the existence of a common scheme or plan because "in both of these cases the allegations will be that the defendant hit the child with the same braided extension cord . . . ."  The defendant argued that although each incident involved corporal punishment, the incidents were not so unusual or peculiar as to reveal a distinctive design.

The trial court agreed with the prosecution, however, stating that the March 1 and April 9, 1998. incidents were identical to one another in several key respects and that proof of each offense was relevant to prove the defendant's intent as to the other offense.  The trial court therefore granted the State's oral motion to consolidate.  In the Court of Criminal Appeals, the defendant challenged the trial court's decision to consolidate the offenses.  However, the Court of Criminal Appeals did not address the issue on the merits, finding that it had been waived.

Initially, we disagree with the Court of Criminal Appeals's conclusion that the defendant failed to preserve the issue for appeal.  Although the prosecution stated that the parties had an informal understanding that the indictments would be tried together, the simple fact is that the record does not reflect that the prosecution made a written or oral motion for consolidation prior to trial or that the parties had entered into an agreed order of consolidation prior to the first day of trial.  See Spicer v. State, 12 S.W.3d 438, 444 n.6 (Tenn. 2000) (indicating that a motion for consolidation should be filed "sometime earlier than the day of the trial when the jury is waiting in the hall").  Because of the prosecution's tardiness in moving to consolidate the indictments, the State  must share responsibility with the defendant for the absence of a clear agreement and the lack of clarity in the record.  This Court has explained:

> After an objection to consolidation has been overruled, the defendant is not then required to immediately move for a severance in order to preserve a severance issue for appeal. Because the trial court in this situation is to consider whether consolidation is proper in light of Rule 14(b)(1), a rule that requires a defendant to formally move for a severance immediately after the objection to consolidation is overruled makes little practical sense. Further, such a rule would emphasize technicality of procedure over substantive fairness, would add unjustifiable expense and delay to the proceedings, and would defeat the very purposes to be served by the Rules of Criminal Procedure.

Id. at 444. Therefore, we disagree with the Court of Criminal Appeals's conclusion that waiver applies to this issue. Having so concluded, we will address this issue on the merits.

Consolidation of multiple offenses against a single defendant in a single trial is governed by Rules 8, 13, and 14 of the Tennessee Rules of Criminal Procedure. As relevant to this appeal, Rule 8(b) of the Tennessee Rules of Criminal Procedure provides that "[t]wo or more offenses may be joined in the same indictment, presentment, or information, with each offense stated in a separate count or consolidated pursuant to Rule 13 *if the offenses constitute parts of a common scheme or plan or if they are of the same or similar character.*" Tenn. R. Crim. P. 8(b) (emphasis added). Rule 13 allows the trial court, at its option, to consolidate or sever offenses for trial in those instances where either the prosecution or the defense could have elected to consolidate or sever. See Tenn. R. Crim. P. 13, Advisory Commission Cmts. Rule 13 provides:

> (a) Consolidation. The court may order consolidation of two or more indictments, presentments, or informations for trial if the offenses and all defendants could have been joined in a single indictment, presentment, or information pursuant to Rule 8.
>
> (b) Severance. The court may order a severance of offenses or defendants before trial if a severance could be obtained on motion of a defendant or of the state pursuant to Rule 14.

Tenn. R. Crim. P. 13. Finally, Rule 14 instructs that where "two or more offenses have been joined or consolidated for trial pursuant to Rule 8(b), *the defendant shall have a right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the trial of the others.*" Tenn. R. Crim. P. 14(b)(1) (emphasis added). Under this provision, the defendant has an absolute right to have offenses separately tried unless the prosecution shows that the offenses are part of a common scheme or plan and evidence of each crime would be admissible in the trial of the others. Spicer, 12 S.W.3d at 443.

–12–

We have considered the interaction and function of Rules 8, 13, and 14 of the Tennessee Rules of Criminal Procedure in a series of recent cases. See Spicer v. State, 12 S.W.3d 438 (Tenn. 2000); State v. Moore, 6 S.W.3d 235 (Tenn. 1999); State v. Shirley, 6 S.W.3d 243 (Tenn. 1999). Moore and Shirley involved multi-count indictments, with the defendant in each case requesting that certain counts be severed and tried separately. Spicer is most similar to this case because it involved the consolidation of two separate indictments for a single trial. The following excerpt from Spicer is instructive:

> In the vast majority of permissive joinder and severance cases, the offenses sought to be joined have been consolidated by the state in the original indictment or information pursuant to Rule 8(b). In the usual case, therefore, the burden is on the defendant to move for a severance of those offenses and to satisfy the criteria of Rule 14(b)(1) before separate trials will be granted. Unless the defendant moves to sever the offenses prior to trial or at an otherwise appropriate time, the defendant waives the right to seek separate trials of multiple offenses. See Tenn. R. Crim. P. 12(b)(5); 14(a).
>
> Less frequently, however, the state may seek to consolidate offenses contained in multiple indictments upon motion pursuant to Rule of Criminal Procedure 13(a). When a defendant objects to the consolidation motion, the state must then demonstrate that the offenses are parts of a common scheme or plan and that evidence of each offense is admissible in the trial of the others.

Spicer 12 S.W.3d at 443-44 (emphasis added). Thus consolidation is proper only if the trial court concludes that

> (1) the multiple offenses constitute parts of a common scheme or plan; (2) evidence of each offense is relevant to some material issue in the trial of all the other offenses; and (3) the probative value of the evidence of other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant.

Id. at 445 (citations omitted). When a defendant objects to a motion to consolidate, the prosecution bears the burden of producing evidence to establish that consolidation is proper. Id. at 447.

In deciding whether consolidation was proper in this case, we first must determine whether the prosecution offered evidence to establish that the offenses constitute parts of a

common scheme or plan.[4]  "[T]here are three types of common scheme or plan evidence: (1) offenses that reveal a distinctive design or are so similar as to constitute 'signature' crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction."  Shirley, 6 S.W.3d at 248 (citing Neil P. Cohen et al., Tennessee Law of Evidence § 404.11, at 180 (3d ed. 1995)).  Although neither the prosecution nor the trial court clearly indicated which category applied in this case, the statements made at the hearing suggest that both relied upon the distinctive design or "signature" crimes category.[5] To reiterate, when ruling on the motion to consolidate the trial court stated as follows:

> Since the crimes . . . are identical in every feature, the same place, the same room, the same method of administering this type of injury, the same weapon, or the same object . . ., they're so identical to each other, going to that issue of intent, I'm going to allow the State to proceed on both of these indictments.

We are constrained to disagree with the trial court's conclusion.  Although offenses may be similar in many respects, "they cannot be classified as signature crimes if they lack a distinct modus operandi."  Shirley, 6 S.W.3d at 248.  The "modus operandi" must be "so unique and distinctive as to be like a signature."  Moore, 6 S.W.3d at 240.  Although the offenses need not be identical in every respect, the *method* employed in committing the offenses must have "'such unusual particularities that reasonable men can conclude that it would not likely be employed by different persons.'"  Shirley, 6 S.W.3d at 248 (quoting Harris v. State, 227 S.W.2d 8, 11 (Tenn. 1950)).  Indeed, the term "modus operandi" has been defined as "'[m]ethod of operating or doing things (M.O),'" and it is a "'[t]erm used by police and criminal investigators to describe the *particular method* of a criminal's activity.'"  Shirley, 6 S.W.3d at 250 n.19 (quoting Black's Law Dictionary 1004 (6th ed. 1990)) (emphasis added).

While the March 1 and the April 9 incidents share a number of similarities, the method employed in committing the offenses does not constitute a modus operandi so unique and distinctive as to be comparable to a signature.  According to the evidence offered by the prosecution, the defendant and the victim were alone in the victim's bedroom during the March 1 incident.  The defendant struck the victim on the buttocks with a heavy-duty extension cord that was braided with wire and wrapped with duct tape.  The incident developed from the victim receiving poor grades on his report card.  The April 9 incident developed from the victim failing to bring home his report card, receiving poor grades on his report card, and running away from home after his mother obtained a copy of his report card from his school.  While the defendant and the victim were again in the victim's bedroom, on this occasion the victim's mother was

---

[4]As the Court of Criminal Appeals noted, the proceedings on the consolidation issue were shortened by the fact that the matter was not raised until the first morning of the trial.  Our analysis in such circumstances necessarily requires review of the evidence at trial.

[5]Indeed, as the defense points out, the prosecution offered no evidence to establish the second or third category.

–14–

standing in the doorway of the room. While the defendant again used a braided extension cord to strike the victim on the buttocks, the extension cord was neither braided with wire nor wrapped with duct tape during the April 9 incident. In addition, during the April 9 incident, the victim was required to lean over a "barrel" or a "big plastic tub," a fact different from the March 1 incident. Furthermore, the prosecution introduced proof to show that during the April 9 incident the defendant wrapped the extension cord around the victim's neck and jerked him around the room, causing the victim to strike objects and furniture in the room, to sustain injuries to his abdomen, neck, and face, and to lose consciousness. In short, the evidence relating to the method employed to commit the April 9 offense is markedly different from the proof relating to the method employed to commit the March 1 incident. See Shirley, 6 S.W.3d at 249 ("Because of the differences in the commissions of the robberies, we are unable to say that a distinct or unique modus operandi was used."). Here, as in Spicer, Shirley, and Moore, the trial court erred in concluding that the multiple offenses constitute parts of a common scheme or plan.

Furthermore, evidence of each offense was not relevant to prove a "material issue in the trial" of the other offense as is required by the second prong of Rule 14(b)(1). The general rule is that evidence of prior crimes, wrongs or acts is not admissible to establish a defendant's propensity or character, yet such evidence may be "admissible for other purposes." Tenn. R. Evid. 404(b); see also Moore, 6 S.W.3d at 239. The other purposes may include evidence of "the motive of the defendant, intent of the defendant, the identity of the defendant, the absence of mistake or accident if that is a defense, and rarely, the existence of a larger continuing plan, scheme, or conspiracy of which the crime on trial is a part." State v. Gilliland, 22 S.W.3d 266, 271 n.6 (Tenn. 2000).

Even if the State had shown that the crimes were parts of a common scheme or plan, consolidation would have been proper only if the evidence of each offense was relevant to prove a material issue in the trial of the other offense. This Court has emphasized that "identity is usually the only relevant issue supporting admission of other offenses when the theory of the common scheme or plan is grounded upon a signature crime." Moore, 6 S.W.3d at 239. In the present case, identity was clearly not at issue. There is no question that the victim identified the defendant as his abuser, and the defendant never argued that the offenses were committed by someone else. See id. In addition, intent was not a material issue. Thus, the trial court erred in concluding that the evidence of each offense was relevant to prove intent as to the other offense. As the defense points out, this Court has previously held in State v. Ducker, 27 S.W.3d 889, 896-97 (Tenn. 2000) and State v. Mateyko, 53 S.W.3d 666, 673 (Tenn. 2001), that child abuse is a "nature-of-conduct" offense. As such, the prosecution need not prove that the defendant "intended" to cause injury to the child. Furthermore, the trial court in this case did not explain how the evidence of each offense was relevant to prove intent as to the other offense. Indeed, the defendant in this case was charged with aggravated child abuse by use of a deadly weapon. To obtain a conviction on this charge, the prosecution needed only to prove that the defendant knowingly treated the victim in a manner that caused injury and that the act causing injury was accomplished with a deadly weapon, which is "[a]nything designed, made or adapted for the

−15−

purpose of inflicting death or serious bodily injury" or something "that in the manner of its use or intended use is capable of causing death or serious bodily injury." Intent simply was not relevant given the charges in this case, and we are unable to discern another issue to which the evidence of each offense was relevant and admissible.

In sum, the March 1 and April 9 offenses did not constitute parts of a common scheme or plan, and the evidence of each offense was not relevant to any material issue in the trial of the other offense. Therefore, we hold that the trial court erred in consolidating the indictments.

## IV. Harmless Error Analysis

Having determined that the trial court abused its discretion in consolidating the indictments over the defendant's objection, we must next consider whether the error more probably than not affected the judgment. See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b); Spicer, 12 S.W.3d at 447. We have previously recognized that "'the line between harmless and prejudicial error is in direct proportion to the degree . . . by which proof exceeds the standard required to convict . . . .'" Spicer, 12 S.W.3d at 447-48 (quoting Delk v. State, 590 S.W.2d 435, 442 (Tenn. 1979)); see also Shirley, 6 S.W.3d at 250; Moore, 6 S.W.3d at 242. "The more the proof exceeds that which is necessary to support a finding of guilt beyond a reasonable doubt, the less likely it becomes that an error affirmatively affected the outcome of the trial on its merits." Gilliland, 22 S.W.3d at 274.

Although the evidence supporting the convictions is legally sufficient, it is hardly overwhelming. Indeed, the March 1 conviction was based solely upon the testimony of the victim. The victim was subjected to vigorous cross-examination as to his truthfulness, and the defense offered two witnesses, including the victim's brother, who provided examples of the victim being untruthful in the past. Furthermore, the defendant presented an alibi, testifying that he had been out of town in Mississippi on March 1, 1998.

Additionally, the proof as to the April 9 incident was disputed. While all witnesses testified that the defendant struck the victim with the braided extension cord, the defendant and Mrs. Toliver testified that the defendant did not place the extension cord around the victim's neck or jerk the victim around the room. Finally, the defense offered several witnesses who described the defendant's general character and reputation for truthfulness as "excellent" or "good."

Also relevant to the harmless error analysis in this case is the fact that the jury heard evidence of each offense even though this evidence was wholly irrelevant. Moreover, this error was exacerbated by the erroneous admission of additional irrelevant evidence of uncharged acts of abuse involving the victim and the victim's brother. The prosecution made extensive use of this inadmissible evidence, both in opening statements and in closing argument. When evidence of other crimes, wrongs, or acts is offered, "a real probability exists . . . that the jury could be

−16−

tempted to convict based upon a defendant's propensity to commit crimes rather than convict solely upon evidence relating to the charged offense." Spicer, 12 S.W.3d at 448; see also State v. James, 81 S.W.3d 751, 758 (Tenn. 2002) (noting that "the admission of other-acts evidence poses a substantial risk that a trier of fact may convict the accused for crimes other than those charged"). That probability is especially great in this case where a great deal of the evidence presented should have been excluded. Therefore, after reviewing the record we conclude that the erroneous consolidation of the indictments combined with the erroneous admission of additional evidence of other uncharged acts of abuse involving the victim and the victim's brother affirmatively appear to have affected the verdict of the jury. Accordingly, new trials are required to ensure that these verdicts were not the result of unfair prejudice. See Spicer, 6 S.W.3d at 251. Other issues raised by the defendant are therefore pretermitted.

## V. Conclusion

After reviewing the record and applicable authority, we hold that the evidence was sufficient to support the jury's verdicts, that the trial court abused its discretion in consolidating the indictments, and that this error, in conjunction with the erroneous admission of evidence of other uncharged crimes, wrongs or acts of abuse, affirmatively appear to have affected the jury's verdict. Accordingly, the judgments of the trial court and Court of Criminal Appeals are reversed. These cases are remanded for new trials at which evidence of other crimes, wrongs, or acts committed by the defendant against the victim or others shall not be admitted unless relevant to a material issue at trial. The costs of appeal are taxed to the State of Tennessee, for which execution shall issue if necessary.

_____
FRANK F. DROWOTA, III,
CHIEF JUSTICE