IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 13, 2017

## STATE OF TENNESSEE v. CHRISTIAN DEVON McDUFFIE

**Appeal from the Circuit Court for Montgomery County**
**No. 41300827    John H. Gasaway III, Judge**
**Jill Bartee Ayers, Judge**

---

### No.  M2017-00103-CCA-R3-CD

---

The Defendant, Christian Devon McDuffie, was found guilty by a Montgomery County Circuit Court jury of three counts of aggravated child abuse, a Class A felony. *See* T.C.A. § 39-15-402 (2014) (amended 2016).  The trial court sentenced the Defendant to concurrent terms of fifteen years for each conviction.  On appeal, the Defendant contends that the evidence is insufficient to support his convictions.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT L. HOLLOWAY, JR., JJ., joined.

Gregory D. Smith (on appeal) and Wayne Clemmons (at trial), Clarksville, Tennessee, for the appellant, Christian Devon McDuffie.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Senior Counsel; John W. Carney, District Attorney General; and Kimberly Lund, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

In this case, the Defendant was indicted for the aggravated child abuse of his two-month-old son after bone fractures to his ribs and humerus were discovered in June 2013.  At the trial, Dr. Christina Cruz, an expert in pediatric medicine, testified that on June 21, she treated the victim for the first time at his two-month well visit.  Dr. Cruz said that the victim's parents were present and that the Defendant reported the victim had not moved his arms in the previous two days.  Dr. Cruz noted that the victim was fussy and had a high-pitch cry that was indicative of pain and observed that the victim was not moving his arms and legs like a healthy two-month-old infant.  Dr. Cruz said that x-rays were taken, that she

conferred with a radiologist, that the victim had multiple bone fractures, and that the victim was taken to Vanderbilt Children's Hospital.

Clarksville Police Detective Candace Rundle testified that she responded to the hospital, that she questioned the Defendant about the victim's bone fractures, and that the Defendant had no explanation for the injuries. Dr. Cruz said that she later spoke to the Defendant at the police station and that the Defendant still did not know how the injuries occurred. She said the Defendant mentioned that he slept on a couch and a bed with the victim and that he could have rolled over on the victim but was unsure. She said the Defendant also stated it was possible he injured the victim when placing the victim in a car seat.

Detective Rundle testified that the Defendant and Jessica McDowell, the Defendant's wife, were the victim's only caregivers. Detective Rundle said that she went to the family home on the same day she responded to the hospital. Photographs of the home were received as exhibits, reflecting the outside of the home and a bassinette beside the Defendant and his wife's bed.

Dr. Verna Brown, an expert in child abuse pediatrics, testified that on July 8, 2013, she treated the victim after his initial treatment on June 21. She noted that the victim's bone fractures had multiple stages of healing. She said that a social worker, the victim's parents, and the victim's foster mother were present. Dr. Brown had the victim's laboratory and skeletal survey results from June 21 but ordered a follow-up skeletal survey to ensure the first survey captured all of the fractures. She said new bone fractures did not show well on an x-ray, especially rib and limb fractures.

Dr. Brown testified that the laboratory tests did not indicate any genetic disorders and that the Defendant stated that he had held the victim's chest and arms too tight. She said that the skeletal surveys showed "nine different fractures, eight of them were of the ribs and [one] of them [was] of the left humerus." She said that the victim had fractures to the fifth, sixth, and seventh left ribs, that the fractures to the fifth and sixth ribs were acute and visible on the initial survey, and that the fracture to the seventh rib "was seen later on." She said that the victim had fractures to the right fifth and sixth ribs, which were visible on the initial survey, and that the follow-up survey showed fractures to the right second, third, fourth, fifth, and sixth ribs.

Dr. Brown testified that infant bones began healing within seven to fourteen days and that she determined that some of the fractures had occurred as recently as within the last seven days. She said that none of the fractures were expected of a two-month-old infant, that she did not know the amount of force used to cause the fractures, and that, based upon the literature, children's ribs were difficult to break because children's bones were pliable. She

said that the victim's fractures were not self-inflicted or the result of "normal play" and that the fractures were caused by blunt force trauma to the chest or "any" type of squeezing mechanism. She concluded that the fractures to the fifth, sixth, and seventh left ribs were non-accidental. Her conclusions was based upon the victim's lack of medical issues, no reported "accidental mechanism," and the victim's having healthy bones, but for the fractures. Relative to the right rib fractures, she concluded that the fifth and sixth ribs were older fractures because they were healing. She said that no medical explanation existed for easily broken bones and that the right rib fractures were "inflicted injury."

Dr. Brown testified that the victim's eight rib fractures, only some of which were healing, indicated more than one trauma. She noted that the victim's humerus, or upper arm, fracture was healing, indicating the injury occurred "on another occasion." She was unable to determine whether the rib and humerus fractures occurred in a single incident or occurred separately. She determined that at least two stages of healing were visible. She stated that broken bones in infants caused pain, which diminished as bones healed. She said it could be difficult to determine from an external examination if an infant had broken or fractured bones because an infant might not present with swelling or bruising. She stated that the humerus fracture was not a common injury for a two-month-old infant because of the immobility of an infant who could not crawl, walk, or jump, and she determined that the fracture was non-accidental.

Dr. Brown testified that a fracture could occur if the victim had been grabbed forcefully from his car seat while his arm was trapped in the car seat strap. She agreed the victim's arm fracture could have been caused by someone leaning over the victim if the victim's arm was forcefully moved above the victim's head while being held tight. She stated that the victim's rib fractures could have resulted if the victim were picked up and squeezed by his torso, causing the victim's cry to change and the victim to cough upon being released. She said the victim's injuries were consistent with the victim's being "snatched" out of his crib by his torso or left arm. She said that the victim's bones were generally healthy and that children who had genetic disorders causing brittle bones did not have healthy bones but rather "ghostly" looking bones. She said that although a car accident might cause bone fractures consistent with the victim's fractures, she did not receive any information indicating the victim had been in a car accident.

On cross-examination, Dr. Brown testified that the victim's rib fractures had two different stages of healing, which included a group of fractures with no signs of healing and another group showing signs of healing. She concluded that the first group of fractures was new and that the second group was seven to fourteen days old. She said that the humerus had begun to heal when she became involved in this case and that as a result, a cast was unnecessary. She said that ribs and humerus fractures were rarely caused during childbirth and that if fractures were caused during childbirth, those fractures would have been healed at

two months of age. Dr. Brown stated that the Defendant reported his grandfather had brittle bone disease and that the victim was tested for the disease but was negative.

On redirect examination, Dr. Brown testified that she excluded all possible accidental causes for the victim's bone fractures and that the Defendant did not report any bone fractures during the victim's birth. She said that if bone fractures from birth occurred, the healing fractures would have been "vague while healed" on the June skeletal survey.

United States Army Criminal Investigation Unit Senior Special Agent Janson Teabout testified that he interviewed the Defendant at Fort Campbell to learn how the victim became injured. Agent Teabout said that the Defendant initially suggested that the victim's injuries could have been caused on June 9, when the Defendant pulled the victim from a car seat. Agent Teabout said the Defendant reported that the victim's arm became stuck in the car seat strap and that the Defendant continued pulling for a couple of seconds. Agent Teabout said that the Defendant stated he had been frustrated on that day because "they" had been walking around a shopping mall.

Agent Teabout testified that the Defendant stated that on June 10, he became frustrated when the victim would not stop crying, that he placed the victim on the sofa and held the victim's arms as tight as he could, and that he pushed the victim's face down into the sofa, while leaning over and placing weight on the victim. Agent Teabout said the Defendant asked the victim why the victim would not stop crying and explained he used enough force to "split open" an orange for about one minute. Agent Teabout said the Defendant noticed that the victim's cry changed during the incident and that the victim coughed.

Agent Teabout testified that the Defendant reported another incident had occurred later in the evening on June 10. Agent Teabout stated that the Defendant said the victim began crying when the victim lay face-down in his bassinet. The Defendant stated that he "snatched" the victim, squeezed the victim, and "threw" the victim in the air to turn the victim around in order for the victim to face the Defendant. Agent Teabout said the Defendant reported squeezing the victim with enough force that the Defendant's fingers were touching as they were wrapped around the victim's torso. Agent Teabout said that the Defendant said he again used enough force to split an orange.

Agent Teabout testified that the Defendant identified another incident on June 10, during which the victim scratched "his" face. Agent Teabout said that the Defendant reported grabbing and squeezing the victim's arms behind the victim's back. Agent Teabout said that he learned of another incident during which the Defendant and the victim were in the living room, that the victim's mother was in another room, and that the victim began to cry, prompting the victim's mother to enter the living room to learn why the victim was

-4-

crying. Agent Teabout said that this frustrated the Defendant, that the Defendant picked up the victim, squeezed the victim hard, and handed the victim to the victim's mother, and that the victim began crying and coughing. On cross-examination, Agent Teabout testified that he did not interview the victim's mother and that the Defendant said he did not think he hurt the victim.

Christina Palmer testified for the defense that she was the victim's "resource parent" for six months after the injuries were discovered. She said she knew the Defendant and Ms. McDowell very well. Ms. Palmer said that generally, she and her husband did not allow birth parents into their home but that the Defendant and Ms. McDowell earned Ms. Palmer's trust quickly. Ms. Palmer said that the Defendant visited the victim twice per week initially and that toward the end of Ms. Palmer's time with the victim, the Defendant visited more frequently. She said that at the time of the trial, she saw "them" biweekly. She said that "they" were like family and that the victim was like a nephew. Ms. Palmer said that in her opinion, the Defendant was a truthful person.

On cross-examination, Ms. Palmer testified that she did not know the Defendant reported forcefully grabbing the victim's arms, holding the victim tight, and placing weight on the victim. She agreed, though, that if the Defendant stated doing these things, she believed the Defendant told the truth. Ms. Palmer acknowledged knowing the Defendant squeezed the victim but denied knowing the Defendant squeezed the victim with enough force to split an orange.

Hector Garcia testified that he had known the McDuffie family for about two years and that the Defendant, Ms. McDowell, and the victim visited his home on the weekends to watch AMC's *The Walking Dead*. Mr. Garcia said that the Defendant was a truthful and peaceful person, who was not quick to anger or to become frustrated. Mr. Garcia denied witnessing the Defendant lose his temper.

On cross-examination, Mr. Garcia testified that he knew the victim was abused but that he did not know the details. Mr. Garcia was surprised and unaware the Defendant stated that he forcefully grabbed the victim's arms, held the victim's arms tight, and leaned on the victim while placing weight on the victim. Mr. Garcia said the Defendant told the truth if he made the statement. Mr. Garcia did not know the Defendant squeezed the victim tight enough to make the Defendant's fingers touch while holding the victim around the torso. Mr. Garcia agreed these actions were not those of a peaceful person. On redirect examination, Mr. Garcia stated that he would believe the Defendant if the Defendant said someone put "words . . . in his mouth."

Vickie Patton testified that she was the associate pastor at the Defendant's church, that she met the Defendant in 2010 or 2011, and that she met Ms. McDowell later. Ms.

Patton said that she saw the Defendant and his family at least once per week and sometimes more. She said that she had been to the Defendant's home and socialized with him and his family. She considered the Defendant and Ms. McDowell to be truthful and peaceful people and denied witnessing the Defendant lose his temper.

On cross-examination, Ms. Patton testified that she met the Defendant before he was deployed to Afghanistan. She knew the victim had fractured bones but did not know how the fractures occurred. She said that she would believe the Defendant if he told her that he squeezed and forcefully grabbed the victim.

James Joshua Wilson testified that he had known the Defendant and his family since September 2011, and that the Defendant was a member of his Army platoon. Mr. Wilson said the Defendant was a truthful, compassionate, and gentle person. Mr. Wilson had never seen the Defendant lose his temper or lash out at anyone.

On cross-examination, Mr. Wilson testified that grabbing and squeezing an infant and holding the infant's arms tightly while placing weight on the infant was not peaceful conduct. He knew the victim had been injured but did not know what occurred.

Army Platoon Sergeant Jason Bochert testified that he had known the Defendant since May 2012, and that he interacted with the Defendant daily. Sergeant Bochert stated that the Defendant was truthful and peaceful. He said that although everyone in the Army became frustrated, he had never seen the Defendant lose his temper. On cross-examination, Sergeant Bochert stated that squeezing and forcefully grabbing an infant was not peaceful conduct and that if the Defendant admitted doing these things, Sergeant Bochert would believe the Defendant.

Jessica McDowell, the Defendant's wife, testified that she and the Defendant had been married for almost four years and that she had known him almost ten years. She said the Defendant was a truthful and peaceful person. She had never seen the Defendant become angry, lash out at anyone, or become violent with the victim.

On cross-examination, Ms. McDowell testified that about two weeks before taking the victim to the pediatrician, she saw a rash on the victim's neck and that the victim had poked his eye with his fingernail, causing a red mark on the victim's eye. She said she and the Defendant treated the rash with ointment and tried to calm the victim by using swaddle blankets. She said that the ointment and the swaddle blankets calmed the victim, that the victim slept, and that the victim ate and played upon waking.

Ms. McDowell testified relative to the incident during which the Defendant and the victim were in the living room that the Defendant became aggravated because he thought she

felt she could do "more things right" with the victim. She said that she told the Defendant to give the victim to her, that the Defendant said he could handle it, that she persisted, and that the Defendant told her to take the victim if she thought she could get the victim to stop crying. She said the Defendant was upset with her, not the victim. She denied witnessing the Defendant pull the victim's arms behind the victim's back.

Ms. McDowell testified that she thought the Defendant's statements about placing the victim on the couch were misconstrued. She said that the Defendant slept on the couch with the victim, that the victim held his arms up, and that the Defendant held the victim. Ms. McDowell said she took photographs of the two sleeping together. Ms. McDowell said that she was present in the room with the Defendant and the victim, except for an occasion on which she left home for twenty minutes to deliver food to a friend and an occasion on which she left home to purchase groceries. She said that the victim was asleep when she left for the grocery store and that the Defendant and the victim were asleep when she returned. Ms. McDowell stated that she was present when these alleged incidents occurred and that she did not think the Defendant held the victim too tight or hurt the victim.

On redirect examination, Ms. McDowell testified that she loved the Defendant but would not protect him if she knew he had done something wrong. She said that she trusted the Defendant with the victim and that the victim and the Defendant had a strong bond. Relative to the victim's arm becoming stuck in the car seat strap, she said that the victim was small and that they purchased pads to ensure the victim's safety. She said that the Defendant tried to remove the victim from the car seat when the victim's arm became caught in the strap.

On recross-examination, Ms. McDowell testified that she was present when the Defendant removed the victim from the car seat on the day they returned from the shopping mall. She denied the Defendant jerked the victim from the car seat.

Upon this evidence, the Defendant was convicted of three counts of aggravated child abuse. This appeal followed.

The Defendant contends that the evidence is insufficient to support his convictions. He argues that the State failed to establish an intent to injure the victim. The State responds that the evidence is sufficient to support three aggravated child abuse convictions. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521

(Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Id.* (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In relevant part, "[a] person commits the offense of aggravated child abuse . . . who commits the offense of child abuse, as defined in § 39-15-401(a) . . . and . . . [t]he act of abuse . . . results in serious bodily injury to the child." T.C.A. § 39-15-402(a)(1). Generally, the offense is a Class B felony, but the offense is a Class A felony if the abused child is eight years of age or less. *Id.* § 39-15-402(b). A person commits a form of child abuse "who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." *Id.* § 39-15-401(a). A person acts "knowingly"

> with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

*Id.* § 39-11-106(a)(20) (2010) (amended 2011, 2014); *see id.* § 39-11-302(b) (2014). "'Serious bodily injury to the child' includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects." *Id.* § 39-15-402(d).

The record reflects that the two-month-old victim had nine bone fractures, consisting of eight rib fractures and one humerus fracture. The bone fractures showed different stages of healing, and laboratory testing ruled out genetic causes. The victim's bones were healthy aside from the nine fractures. Fractures to two left ribs were visible in the initial x-rays, and a fracture to a third left rib was visible in the subsequent x-rays. Factures to two right ribs were visible in the initial x-rays, and fractures to five right ribs were visible in the

subsequent x-rays. Dr. Brown concluded that the victim's bone fractures were the result of blunt force trauma to the chest or any type of squeezing mechanism. She excluded normal play and parenting as causes for the fractures. She, likewise, excluded car accidents and trauma during childbirth as causes for the fractures because no car accidents had been reported and because fractures during childbirth would have healed before the victim was two months old. Although Dr. Brown could not determine the specific number of traumas the victim experienced, she concluded that the different stages of healing indicated more than one trauma. She determined that the fractures showing signs of healing were seven to fourteen days old and that the fractures not showing signs of healing were newly inflicted.

The Defendant reported various incidents during which the victim's bones could have been fractured, and Dr. Brown testified that the incidents reported by the Defendant were consistent with the victim's injuries. The first incident described by the Defendant occurred on June 9, when the Defendant pulled the victim from the car seat. The Defendant said the victim's arm became stuck in the car seat strap and that the Defendant continued pulling for a couple of seconds. He admitted being frustrated because "they" had been to a shopping mall.

The Defendant reported additional incidents occurring on June 10. The Defendant stated that he became frustrated when the victim would not stop crying, that he placed the victim on the sofa, held the victim's arms as tight as he could, pushed the victim's face down into the sofa, and leaned over the victim, placing weight on the victim. The Defendant said that the victim's cry changed and that the victim coughed. Relative to the second incident on June 10, the Defendant stated that the victim began to cry, that the Defendant snatched the victim from his bassinet, squeezed the victim, and threw the victim in the air to turn around the victim. The Defendant stated that he squeezed the victim with enough force that the Defendant's fingers touched while his hands were around the victim's torso. A third incident occurred on June 10 when the Defendant grabbed and squeezed the victim's arms behind the victim's back.

Agent Teabout testified that he learned of another incident during which the victim and the Defendant were in the living room and Ms. McDowell was in the kitchen. The victim cried, prompting Ms. McDowell to walk to the living room from the kitchen to determine why the victim was crying. The Defendant became frustrated with Ms. McDowell, and the Defendant picked up and squeezed the victim and handed the victim to Ms. McDowell.

The Defendant does not dispute that his conduct caused the victim's bone fractures. He argues, rather, that he did not intend to injure or to hurt the victim and that the evidence does not show the bone fractures were intentionally inflicted. The Defendant's arguments

are misplaced. Aggravated child abuse, in relevant part, requires that a defendant commit the offense of child abuse and that the abuse result in serious bodily injury. T.C.A. § 39-15-402(a)(1). It is not disputed that the victim's bone fractures constitute serious bodily injury. *Id.* § 39-15-402(d). Relative to the required mental state, "child abuse is a 'nature-of-conduct' offense," and the State is not required to "prove that the defendant intended to cause injury to the child." *State v. Toliver*, 117 S.W.3d 216, 230 (Tenn. 2003) (internal quotation marks and citations omitted). The State is required to prove beyond a reasonable doubt that the Defendant knowingly treated the victim in an abusive manner and that the treatment resulted in serious bodily injury. *Id.* § 39-11-106(a)(20). The evidence sufficiently established that the Defendant knowingly engaged in the conduct that resulted in the victim's bone fractures. Therefore, the evidence is sufficient to support the convictions.

Although the Defendant's argument focuses on his lack of intent to injure the victim, he appears to argue in his brief as an aside that insufficient evidence exists showing the jury reached a "unanimous verdict on a single act that injured [the victim's] ribs." This is the extent of the Defendant's argument, and he does not cite to legal authority supporting this claim. We have reviewed the transcript, and it reflects that an extensive discussion was held regarding the State's obligation to make an election of the offenses based upon the evidence of multiple incidents presented during the trial. During the trial court's final jury instructions, the court stated the following:

> To ensure a unanimous verdict, the law requires the state to elect which alleged act testified to the state is relying upon for your consideration in deciding whether or not the defendant is guilty of this offense or any lesser included offense. . . .
>
> In this case, the state had elected to submit for your consideration as to Count One the allegation that the defendant squeezed the torso of the child while carrying the child from one room to another.
> In this case, the state has elected to submit for your consideration as to Count Two the allegation that the defendant snatched the child from the child's bassinet, tossed the child in the air and then squeezed the torso of the child until the defendant's fingertips touched.
>
> In this case, the state has elected to submit for your consideration as to Count Three the allegation that the defendant grabbed the child's arm and pushed the child face down into the sofa.
>
> Members of the jury, you are to consider only this alleged act in deciding whether or not the defendant has been proven guilty behold a

reasonable doubt of the offenses charged and included in Counts One, Two and Three.

Based upon the evidence presented at the trial, the election of the offenses is sufficient to ensure the jury rendered a unanimous verdict on each count of the indictment. *See, e.g., State v. Adams*, 24 S.W.3d 289, 294 (Tenn. 2000); *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997); *State v. Shelton*, 851 S.W.2d 134, 138 (Tenn. 1993); *State v. Brown*, 762 S.W.2d 135, 137 (Tenn. 1988). The court's instructions prevented any patchwork verdict and ensured jury unanimity on each count of the indictment. The jury was provided the factual basis for each count in order to differentiate among the various incidents presented during the State's case-in-chief. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE