IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 25, 2005

## STATE OF TENNESSEE v. ELIJAH HAMMOND

**Appeal from the Criminal Court for Bradley County**
**Nos. M-02-296 and M-03-349      Carroll L. Ross, Judge**

---

**No. E2004-01061-CCA-R3-CD - Filed April 15, 2005**

---

Following a bench trial before the Bradley County Criminal Court, the defendant, Elijah Hammond, was found guilty of aggravated child abuse by use of a deadly weapon and of aggravated assault involving his minor daughter, ST.[1]  The court merged the convictions and sentenced the defendant to serve 12 years in the Department of Correction.  On appeal, the defendant contends that the evidence is insufficient to support his aggravated child abuse conviction and that he was improperly classified and sentenced as a Range II, multiple offender.  After an extensive review of the record, the briefs of the parties, and applicable law, we conclude that the evidence supports his aggravated child abuse conviction and that, pursuant to an amended judgment of conviction, the defendant was properly sentenced as a Range I, standard offender to serve an incarcerative, 12-year sentence.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which GARY R. WADE, P.J., and NORMA MCGEE OGLE, J., joined.

Charles M. Corn, District Public Defender; and Richard Hughes, Assistant District Public Defender, for the Appellant, Elijah Hammond.

Paul G. Summers, Attorney General & Reporter; William G. Lamberth, II, Assistant Attorney General; Jerry N. Estes, District Attorney General; and Stephen D. Crump, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

Charlotte Timberlake, the victim's third-grade teacher at Arnold Elementary in Bradley County, testified that when the victim came to school on November 15, 2002, she was very quiet and had trouble walking.  During the school day, Ms. Timberlake noticed that the back of the

---

[1]To protect the identity of minor victims of child abuse, it is the policy of this court to refer to the victims by their initials.

victim's clothing appeared to be brown, and the teacher escorted the victim to the office to get fresh clothes and then to the bathroom.  Officer Evelyn Lastra accompanied them, and after initial resistance, the victim allowed Ms. Timberlake to pull down her pants and underwear, at which time Ms. Timberlake observed the victim's blood covered bottom and raw skin.

The victim began shaking, and Ms. Timberlake talked to her to keep her calm.  The victim insisted that nothing had happened to her, and Ms. Timberlake described the girl as "just in total denial the whole time."  Officer Lastra took pictures to document the injuries, and all the while the victim kept repeating, "There's nothing wrong."   The victim did not want to leave Ms. Timberlake when Officer Lastra was ready to transport her to the hospital, but ultimately the women convinced the victim to accompany Officer Lastra.  Ms. Timberlake said that the last thing she remembered was the victim saying that she did not want to go home and that she wanted to return to school.

On cross-examination, Ms. Timberlake explained that the defendant was a "concerned parent" and that the victim had perfect attendance.  She had met with the defendant on more than one occasion because he "wanted to make sure [the victim's] grades were good," and Ms. Timberlake testified that the victim was a "straight A student."  The only thing unusual with the child that Ms. Timberlake had noticed was that she was very quiet and kept to herself.  Ms. Timberlake recalled there had been two prior occasions when the victim had been sick; once, the victim was running a very high fever at school, and the school nurse called the defendant who came and took the victim home.  Evidently, the defendant later sought medical treatment, and the victim was hospitalized for the fever.  On the second occasion, Ms. Timberlake said that the school infirmary "didn't really want to call him at all."

Cleveland Police Officer Evelyn Lastra testified that she was assigned as a school resource officer for all the elementary schools in the city limits.  She was working on November 15, 2002, and at approximately 9:30 a.m., Officer Lastra received a telephone call from the secretary at Arnold Elementary; the secretary was crying and requested Officer Lastra's presence at the school because of "a severe child abuse case."  Officer Lastra was told of the blood that had seeped through the child pants.  Officer Lastra said that she took the victim to the bathroom and talked to her in the presence of several female teachers.  Officer Lastra told the victim that it was important for the officer to see what was wrong, but when the officer tried to pull down the child's pants, "it hurt her too much."  Officer Lastra enlisted the help of Ms. Timberlake.  The two women pulled the child's gray pants down, which exposed black spandex shorts.  When the shorts were pulled down, Officer Lastra observed that the victim was wearing turquoise underwear that was "totally stained with blood."  The women slowly peeled away the underwear, which "exposed the injuries that were from the top of her waist down to about three, three-fourths of her thighs, the back of her thighs, which was red, purple, and blue, and she was had no skin on her buttocks area."

Officer Lastra photographed the victim's injuries, contacted the Department of Children's Services, and transported the victim to the Bradley County Emergency Room for evaluation.

Doctor Ann Morgan was on shift when Officer Lastra brought the minor victim into the emergency room on November 15, 2002. Dr. Morgan testified that the victim displayed "severe bruising and swelling to her buttocks and thigh area." Dr. Morgan identified photographs of the victim's injuries, and Dr. Morgan described the bruising as "significant." She explained, "The bruising is not only visually dramatic here, but it was thick. It was hard, the bruising was so thick." Dr. Morgan also identified other areas of the buttocks where the skin was "denuded . . . a raw scrape-like area" that was similar to "an open burn or a severe abrasion."

In Dr. Morgan's opinion, a "large amount of force" would be necessary to produce the injuries that she saw. As for the denuded skin areas, Dr. Morgan said that producing such injuries would require "repeated trauma or friction to cause the destruction of the top layers of skin." From x-rays that Dr. Morgan ordered, she also isolated two recent rib fractures on the victim's right side.

On cross-examination, Dr. Morgan said that she treated the denuded skin areas with a salvadine ointment, commonly used for burn injuries, and recommended Tylenol or Motrin for pain control. The victim was released the same day and referred to Chattanooga for a more formal child abuse evaluation.

The victim took the stand and testified that she currently was in foster care because her "dad beat [her]." Leading up to the beating, the victim explained that she had been on a school field trip and had told her teacher where she lived. A classmate overheard the conversation and told the victim's father. When the victim got home that day, the defendant "took out the paddle and whipped [her]." The victim was lying on her bed at the time, and the defendant struck her "a bunch" of times. Afterwards, the victim took a shower while the defendant watched her. When asked if the defendant had watched her shower on other occasions, the victim acknowledged that he had; she mentioned that he had watched her before when he whipped her with "hangers."

After the paddling and taking a shower, the victim said that she dressed and slept at her aunt's house. The victim believed that the defendant took her to school the next day. The defendant worked at night, and when he had to leave for work, he would wake up the victim and take her to the aunt's house for the rest of the night. Then, when he would get off work, the defendant came by and took the victim to school.

On cross-examination, the victim denied that the defendant had ever warned her not to divulge where they lived. The victim did recall that at one time, she lived with the defendant and his mother; her mother resided in Florida, but the victim never saw her. At some point, she and the defendant moved, and the two of them were living alone when the paddling occurred. The victim said that the defendant had spanked her with the paddle two other times. Each time, she was clothed when he spanked her.

Tracy Hill, a child protective service investigator with the Department of Children's Services, testified that she performed the investigation involving the victim's injuries. Ms. Hill

spoke with the defendant on November 18. Ms. Hill testified that the defendant told her that he "discipline[d] her because she had told the teachers where she lived, and he gave her a spanking that day after school." Ms. Hill recalled that the defendant also told her that he spanked the victim with a paddle, giving her approximately "eight licks."

Regarding the victim's injuries, the defendant's explanation to Ms. Hill was that although he disciplined the victim, "he didn't feel that he caused the injuries." Other than using a paddle for discipline, the defendant related that he had required the victim to exercise, such as doing push-ups or jogging.

The trial court was puzzled why telling the teacher her home address prompted the victim's spanking. Ms. Hill was not entirely clear on that point, either; she told the court that based on her conversations with the defendant and the victim, she learned that evidently the victim talked to classmates at another school she had attended and divulged that DCS was investigating her father on an earlier complaint. Subsequently, a classmate's parents contacted law enforcement, and officers were dispatched to the defendant's residence. Ms. Hill gathered from that incident that the victim was forbidden to talk about where she lived.

On cross-examination, Ms. Hill was asked about the earlier DCS investigation. She said that the victim had a suspicious bruise on her arm, which prompted the defendant's arrest for abuse. The defendant was required to attend parenting classes, and after he completed the classes, the charge was dismissed. Ms. Hill agreed that the defendant was honest with her about his background, including that he had spent time in prison. The defendant told Ms. Hill that after he was released from prison, he obtained legal custody of his daughter because the child's mother, who lived in Florida, could not care for the child.

The defense questioned Ms. Hill about the report of her investigation. In her report, Ms. Hill wrote that the victim told her at the hospital that she had showered before she received the spanking. Ms. Hill acknowledged what she had written, but she added that the defendant told her that the victim showered afterwards. In her report, Ms. Hill also expressed her concerns about the defendant's lack of knowledge of appropriate discipline and about continued abuse of the victim should she be returned to the defendant.

Cleveland Detective John Dailey, Jr., testified that he was involved in the case investigation. He obtained a search warrant for the defendant's residence to locate and seize the black paddle that the defendant used on the victim. Detective Dailey located the item, and it was introduced as an exhibit. The following writing appeared on one side of the paddle: "Proverbs 22:15, Foolishness is bound in the heart of a child, but the rod of correction shall drive it far from them." On the other side of the paddle, the following writing appeared: "Proverbs 19:18, Chasten the child, thy child while there is hope, and let not thy soul spare for their crying." The paddle also contained the initials "E.H.," the date "12/1 of 2001," and "Also read Proverbs 23:14."

The defense called two witnesses. Gwendolyn Rudolph was the victim's babysitter,

the person the victim referred to as her "aunt." Ms. Rudolph testified that she began babysitting the victim in approximately April of 2002. Because the defendant was working a third-shift job at Duracell, he would bring the victim to her house between 11:00 and 11:30 p.m. The victim would spend the night with Ms. Rudolph, and in the morning the defendant would pick up the victim and drive her to school.

Ms. Rudolph recalled nothing unusual about the victim when the defendant brought her over on the evening of November 14. Ms. Rudolph thought the victim was wearing a shirt and some sweat pants, and Ms. Rudolph recalled that the victim wanted to stay up and watch a television movie. Ms. Rudolph said that she told the victim that tomorrow was a school day and that she had to go to bed. According to Ms. Rudolph, the victim was not walking or acting unusual, and the victim did not complain of any injury. Likewise, Ms. Rudolph said that she noticed nothing unusual in the morning.

On cross-examination, Ms. Rudolph testified that the defendant did not tell her about spanking the victim when he dropped her off at Ms. Rudolph's home on November 14. Ms. Rudolph also insisted that she never noticed any wet spots on the victim's pants and that the mat on which the victim slept at her house was not stained. Ms. Rudolph denied ever spanking the victim or touching her bottom.

The 28-year-old defendant took the stand in his own defense. He testified that he found out that the victim was his child in 1998, while he was incarcerated in Kentucky on multiple reckless endangerment convictions. In response to questioning by the court, the defendant admitted that he had numerous other convictions for which he had been incarcerated nearly one-half of his life. His prior offenses included robbery, trespass, car theft, and burglary.

After the defendant was released from Kentucky confinement in 2001, he made arrangements to get custody of his daughter who was in foster care in Florida. The defendant and the victim then moved in with the defendant's mother who resided in Cleveland, Tennessee. The defendant testified that after they settled in, he and his mother had a bitter argument over whether she was trying to get custody of the victim and take her away from the defendant. The defendant's mother ultimately "kicked [him] out" but forced the victim to remain. The following day, the defendant picked up the victim at school and made arrangements for a new place to live. The defendant's fear that his mother might kidnap the victim led to his concern for keeping his address secret.

Regarding the bruise on the victim's arm that was investigated by DCS in March of 2002, the defendant said that he was charged and, by agreement, the charge was dismissed after he attended six weeks of parenting classes in Chattanooga. In terms of general discipline, the defendant testified that he either made the victim write out her spelling words 10 or 20 times or he spanked her with the paddle that had been introduced as an exhibit. Prior to November 14, the defendant believed that he had paddled the victim on three other occasions. The defendant claimed that as he was throwing away trash at the old Cleveland Middle School, where he was working construction,

he found the paddle. He admitted writing the Bible quotations on the paddle; he said he did so to remind himself that the scripture "said that it was okay to spank [his] daughter" to discipline her.

The defendant testified about picking up the victim from school on November 14 and having a "feeling" that she told someone where they lived. He said he told her that she was going to get a spanking when they got home. Before the spanking, however, the defendant testified that the victim did her homework, he cooked dinner, and the victim took a shower and dressed. Then, the defendant had the victim come over to her bed, and he struck her with the paddle approximately eight to 10 times. The defendant denied telling Ms. Hill that he watched the victim shower after he spanked her. He testified that what he said was that he had watched her shower before so he could coach her on how to properly wash her body and shampoo her hair.

Defense counsel showed the defendant the photographs of his daughter's injuries. He insisted that he did not cause the injuries, although he admitted striking her eight to 10 times. He maintained that he noticed no blood on the victim's pants and that she did not behave any differently after the spanking. The defendant did not believe that the victim had fallen or hurt herself after the spanking, and he did not think anyone else had spanked the victim. The defendant, for all intents and purposes, had no explanation for his daughter's injuries.

On cross-examination, the defendant was evasive about his address at the time of the events in November 2002. He claimed not to be sure of the street name; however, after repeated questioning about the address he had given the victim's elementary school, the defendant admitted lying and having just "made up an address" that was within the school zone. The defendant denied, though, punishing the victim because she had exposed his lie by telling school personnel their actual address.

Regarding the photographs that had been entered as exhibits, the state presented them to the defendant and specifically asked, "You're telling the Court that you had nothing to do with this (indicating)." The defendant responded that he "had nothing at all to do with that" and that he didn't "believe the spanking that, that she got would have did that at all." The defendant also denied dressing the victim in multiple layers of clothing to conceal her injuries. The state concluded its cross-examination by asking if the defendant had any explanation for the injuries or for the victim's broken ribs. The defendant said, "No."

Based on the evidence presented, the trial court, as the trier of fact, found the defendant guilty of aggravated child abuse by use of a deadly weapon and of aggravated assault, and it merged the convictions. At a separate hearing, the trial court then sentenced the defendant to serve 12 years in the Department of Correction. Aggrieved of his conviction and sentence, the defendant has appealed.

## I. Timeliness of the Appeal

Although the issue is not raised by the state or mentioned by the defendant, we are confronted initially with the timeliness of the defendant's appeal. The record before us contains two

judgment of conviction forms, one for the defendant's aggravated child abuse conviction and the other for the merged aggravated assault conviction. The aggravated child abuse judgment was filed on August 15, 2003.

On September 11, 2003, the defendant timely filed a motion for new trial. Thereafter, on March 29, 2004, a generic written order was entered denying the new trial motion. That same day, the record reflects that an Amended Judgment regarding the aggravated child abuse conviction was entered; it changed the defendant's offender status from multiple to standard and awarded pretrial jail credits.

The defendant's notice of appeal was not filed until April 29, 2004. The notice, accordingly, was untimely. *See* Tenn. R. App. P. 4(c). Even so, Appellate Rule 4(a) provides in pertinent part, "[H]owever, in all criminal cases the 'notice of appeal' document is not jurisdictional and the filing of such document may be waived in the interest of justice." Tenn. R. App. P. 4(a). Unlike situations wherein a defendant may have been weeks late in filing a notice of appeal, *see State v. Ronnie K. Daniel*, No. M2001-03092-CCA-R3-CD (Tenn. Crim. App., Nashville, Nov. 22, 2002), we note that the notice in this case was untimely by only one day. Additionally, we have reviewed the issues raised on appeal and find them to be well presented and clearly stated. All things considered, we believe that the interest of justice will be better served by waiving the timely filing of a notice of appeal, and we now proceed to the merits of the defendant's appeal.

## II. Sufficiency of the Evidence

The defendant contends that the evidence is insufficient to support his conviction for aggravated child abuse. Our consideration of that claim is grounded in legal bedrock. When an accused challenges the sufficiency of the evidence, an appellate court inspects the evidentiary landscape, including the direct and circumstantial contours, from the vantage point most agreeable to the prosecution. The reviewing court then decides whether the evidence and the inferences that flow therefrom permit any rational fact finder to conclude beyond a reasonable doubt that the defendant is guilty of the charged crime. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Duncan*, 698 S.W.2d 63, 67 (Tenn. 1985); *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000).

In determining sufficiency of the proof, the appellate court does not replay and reweigh the evidence. *See State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Witness credibility, the weight and value of the evidence, and factual disputes are entrusted to the finder of fact – in this case, the trial court. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); *Farmer v. State*, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). Simply stated, the reviewing court will not substitute its judgment for that of the trier of fact. Instead, the court extends to the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences that may be drawn from the evidence. *See Cabbage*, 571 S.W.2d at 835.

With these principles in mind we must determine whether the evidence in this record is sufficient to support the trial court's verdict. We begin with the definition of the conviction offense. The offense of child abuse is committed when a person "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." Tenn. Code Ann. § 39-15-401 (2003). The offense of aggravated child abuse is committed when (1) the act of child abuse results in "serious bodily injury" to the child or (2) the act of child abuse is accomplished with a "deadly weapon." *Id.* § 39-15-402(a)(1), (2). A "deadly weapon" is defined in the Code as follows: "(A) A firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury; or (B) Anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 39-11-106(5)(A), (B). "Serious bodily injury" is defined as injury involving: "(A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; or (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." *Id.* § 39-11-106(34).

The trial court in this case found the defendant guilty of the mode of aggravated child abuse accomplished with a deadly weapon. *Id.* § 39-15-402(a)(2). In closing argument, the state had conceded the defense argument that the serious bodily injury mode of aggravated child abuse had not been established, and in announcing its verdict, the trial court signified its agreement. We, thus, confine our review to the trial court's verdict.

Central to the defendant's theory of defense at trial was the argument that although the defendant should have known that his use of the paddle was going to injure the victim, he was using the paddle, as intended, to discipline the child. According to the defendant, the state failed to prove "knowing child abuse."

The defendant's argument treads into an uncertain area of the law. We know from *State v. Ducker*, 27 S.W.3d 889, 896-97 (Tenn. 2000), and *State v. Mateyko*, 53 S.W.3d 666, 673 (Tenn. 2001), that child abuse is a "nature-of-conduct" offense. "As such, the prosecution need not prove that the defendant 'intended' to cause injury to the child." *State v. Toliver*, 117 S.W.3d 216, 230 (Tenn. 2003). The conviction offense in this case, however, was aggravated child abuse accomplished with a deadly weapon. As previously noted, the Code defines a "deadly weapon" as including "anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury" or was "in the manner of its use or intended use . . . capable of causing death or serious bodily injury." Tenn. Code Ann. § 39-11-106(a)(5)(A), (B) (2003).

How, if at all, the definition of "deadly weapon" modifies the element of "child abuse" is not entirely clear. In *Toliver*, the defendant was convicted of two counts of aggravated child abuse by use of a deadly weapon. Regarding the first conviction count, the "victim testified that the defendant struck him on the buttocks with a heavy-duty extension cord wrapped with coat hangers and duct tape." 117 S.W.3d at 226. For the second conviction count, the "victim testified that the defendant struck him twice with the braided extension cord, wrapped the cord around his neck, then began slinging him around the room, causing the victim to strike objects and furniture in

the room and to sustain injuries to his ribs, neck, and face." *Id*. Five members of the court, without great elaboration, concluded that the evidence was sufficient to support the jury's verdict finding the defendant guilty of two counts of aggravated child abuse by use of a deadly weapon. *Id*. at 226 (majority opinion), 233 (Birch, Jr,. J., concurring), 238 (Anderson, J., dissenting).

The major point of engagement in *Toliver* concerned the consolidation of the indictments in conjunction with the admission of evidence of other crimes, wrongs, or acts. Four members of the court ruled that consolidation was improper and that the erroneous admission of other-crimes evidence affirmatively appeared to have affected the verdict of the jury. *See id*. at 218.

The divergent views about consolidation expressed in *Toliver* have relevance to the issue in this case. Specifically, the majority opinion discusses, as it must, the Criminal Procedure Rule 13 consolidation requirement that the evidence of each offense be relevant to prove a material issue in the trial of the other offense. Regarding "intent" as a possible material issue supporting consolidation, the majority opinion states,

> [T]he trial court erred in concluding that the evidence of each offense was relevant to prove intent as to the other offense. As the defense points out, this Court has previously held in . . . *Ducker* . . . and *Mateyko*, . . . that child abuse is a "nature-of-conduct" offense. As such, the prosecution need not prove that the defendant "intended" to cause injury to the child. Furthermore, the trial court in this case did not explain how the evidence of each offense was relevant to prove intent as to the other offense. Indeed, the defendant in this case was charged with aggravated child abuse by use of a deadly weapon. To obtain a conviction on this charge, the prosecution needed only to prove that the defendant knowingly treated the victim in a manner that caused injury and that the act causing injury was accomplished with a deadly weapon, which is "[a]nything designed, made or adapted for the purpose of inflicting death or serious bodily injury" or something "that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Intent simply was not relevant given the charges* in this case, and we are unable to discern another issue to which the evidence of each offense was relevant and admissible.

117 S.W.3d at 230 (emphasis added). This language plainly suggests that the definition of "deadly weapon" does not convert aggravated child abuse into a result-of-conduct offense.

Justice Anderson, however, parted company with majority opinion in *Toliver*. He analyzed whether intent was a material issue in the following fashion:

> The majority concludes that the offenses were not relevant to

intent or any other material issue. While the majority correctly states that child abuse is a "nature of conduct" offense, *see State v. Ducker*, 27 S.W.3d 889, 896-97 (Tenn. 2000), that does not resolve the issue. The charges in this case were *aggravated* child abuse. The prosecution was required to establish that the defendant knowingly treated the victim in a manner that caused injury and that the defendant did so by employing a "deadly weapon." The latter issue required the jury to determine whether the defendant used a device that was "designed, made or adapted *for the purpose of inflicting death or serious bodily injury*" or was "in the manner of its *use or intended use* capable of causing death or serious bodily injury." Tenn. Code Ann. § 39-15-402(a) (emphasis added). Accordingly, I would conclude that the offenses were admissible for the jury to consider the defendant's motive, purpose, and intent in using the braided extension cord as it related to the required element of "deadly weapon."

*Id*. at 236 (Anderson, J., dissenting) (emphasis in original).

Justice Birch took the opportunity in *Toliver* to "raise the level of discussion" about the ostensible failure of the "[m]odern child abuse statutes" to "expressly recognize the parent's right to reasonably corporally punish a child." *Id*. at 232-33 (Birch, Jr., J., concurring). He expressed the view that "a parent has a right to corporally punish a child and such conduct becomes criminal only when the physical portion of that punishment becomes unreasonable." *Id*. at 233 (Birch, Jr., J., concurring).

*Toliver* may perhaps create more questions than provide answers to interpreting the offense of aggravated child abuse by a deadly weapon. The defendant in this case seeks to exploit the situation by arguing that his conduct is nothing more than a parent exercising the right to paddle his or her child in a completely traditional context. We disagree, and in our opinion, the defendant's conduct offends all of the viewpoints expressed in *Toliver*.

First, the "paddle" used to inflict the child's injuries is wholly unlike the traditional image of a paddle used for spanking; the image that usually comes to mind is of a flat piece of wood with a short handle. The implement in this case has a long narrow handle, and the striking surface is likewise narrow and long. We agree with the state's assessment on appeal that "[t]his paddle resembles a baseball bat more than it does any type of instrument that might be used to punish a child for misbehavior." Without doubt, this "paddle" was clearly capable of causing or inflicting extreme pain, obvious disfigurement, or even death. *See State v. Eaves*, 959 S.W.2d 601, 604 (Tenn. Crim. App. 1997) (holding that a hard plastic Bic or Papermate pen was a "deadly weapon" when used to stab a deputy as it was capable of causing either "extreme pain" or "obvious disfigurement") (listing other objects that had been characterized as deadly weapons).

-10-

Second, the defendant insists that the "paddle" was used in a traditional manner, as evidenced by the child not having any injuries outside the area of the buttocks. The trial court flatly rejected that argument, as was its prerogative as fact finder. The testimony and photographic exhibits in this case clearly establish that the victim's injuries were not confined to the area of the buttocks; indeed the photographs show redness and swelling from the waistline to the thighs and upper leg area and bruising along the side of the victim's body. Doctor Morgan testified that the victim displayed "severe bruising and swelling to her buttocks and thigh area" and that x-rays isolated two rib fractures on the victim's right side.

Last, the trial court found the defendant's testimony to be suspect and not credible in many respects. From the evidence, the trial court reasonably inferred that the defendant repeatedly struck the victim because she had exposed his deception to the school officials about living in a school-zoned neighborhood and not because, as he tried to claim, that he lived by the "scripture" which authorized spanking children. The defendant had attended court-ordered parenting classes; he had been specifically instructed not to use a paddle to discipline his child, but he ignored that instruction and solicited, instead, the opinions of other unidentified construction workers and pastors who endorsed spanking children. In the course of the victim's testimony, she mentioned that the defendant had spanked her not only with the "paddle" but that he had "whipped [her] with hangers" in the past.

The evidence, viewed in the light most favorable to the state, supports the defendant's conviction. Factually, the defendant's actions in this case and his choice of weapon are at least as eggregious, if not more so, than the evidence in *Toliver* relating to the first conviction count. The March 1st incident in *Toliver* involved the defendant striking a fully clothed, teenage victim on the buttocks with a heavy-duty extension cord wrapped with coat hangers and duct tape. Even though the views of the members of the *Toliver* court differed in certain respects, the Justices appeared like-minded that a parent is not immune from prosecution or conviction for aggravated child abuse accomplished with a deadly weapon merely because the victim is clothed, because the situs of the injury centers on the buttocks, or because the injury is inflicted by a paddle-like object.

The evidence, we hold, is sufficient to support the defendant's conviction for aggravated child abuse by use of a deadly weapon.[2]

### III. Sentencing

For his last issue, the defendant argues that he was improperly classified and sentenced as a Range II, multiple offender. The transcript of the sentencing hearing reveals that the

---

[2] The defendant asserts as a secondary argument that the trial court should have considered the lesser included offense of child abuse and the alternative, charged counts of aggravated assault and reckless aggravated assault. In his brief, the defendant writes that he "relies upon the arguments made in the first issue for review that the paddle used . . . to spank his daughter was not a deadly weapon." The defendant does not further elaborate, argue, or cite to the record. Inasmuch as the defendant received a bench trial and no jury-instructional error is raised, we deem it unnecessary to dwell on this matter.

trial court ruled, "I find the State has met its burden of showing that you are within range II." Regarding enhancement and mitigating factors, the trial court stated,

> At that point, we begin with a minimum of 12 years. In order to enhance that, the State must show certain enhancement factors. They have proposed under section 40-35-114, subparagraphs (2), (6), and (16) . . . . I find they have met their burden on subparagraph (2) . . . .

> Subparagraph (6) I find is a part of the actual – it's too similar to an element of the crime itself. . . . I just find it's a part of the offense and that I can't in effect find it as an enhancement factor.

> I find that the State has also met its burden on a, on subparagraph (16) in that this was a position of private trust, in that she was your daughter. . . .

> I find that no mitigating factors have been shown here today in the proof before the Court.

> So, I do find those enhancement factors to exist, subparagraphs (2) and (16). However, I decline to use those to increase your punishment more than 12 years. . . . I'm just not willing to use those to enhancement the punishment up – just to be realistic, if you kicked into range I, I probably would have used these. But I think with a 12-year sentence . . . that is a consistent punishment with the actual crime that I see committed here today.

The aggravated child abuse judgment in the record, filed August 15, 2003, is consistent with the trial court's imposed sentence; it shows that the defendant was found guilty of aggravated child abuse by bench trial, was classified as a Multiple, Range II offender, and received a 12-year sentence. For reasons unknown and not evident in the record before us, on March 29, 2004, approximately seven months later, an "Amended Judgment" was entered and filed. That judgment changed the defendant's offender status to Standard, Range I, but it left the 12-year sentence in place.

On appeal, the state argues "no harm, no foul," so to speak. It points to the Amended Judgment as disposing of the defendant's claim that he was improperly sentenced as a Range II, Multiple offender: "The trial court's correction of the error on the sentencing form renders the defendant's argument moot."

It appears that the trial court had jurisdiction to amend the original judgment. That is, as a general rule, a trial court's judgment becomes final thirty days after its entry unless a timely

notice of appeal or a specified post-trial motion is timely filed. *See* Tenn. R. App. P. 4(a), (c); *State v. Pendergrass*, 937 S.W.2d 834, 837 (Tenn. 1996). The defendant's new trial motion was timely, and the trial court retained jurisdiction of the case until 30 days after the motion was denied. It also appears on the face of the record that both prosecution counsel and counsel for defendant signed the Amended Judgment. Therefore, we treat the Amended Judgment as controlling and regard the defendant to be serving an incarcerative, 12-year sentence as a Range I, standard offender.

As a Range I, standard offender, the defendant's 12-year sentence represents a maximum sentence within the Class B felony conviction range of eight to 12 years. *See* Tenn. Code Ann. § 40-35-112(a)(2) (2003). Oddly, the defendant does not challenge the length of his sentence even though his argument about improper offender classification, if correct, would conceivably make him eligible for an eight-year sentence. Nevertheless, the trial court's remarks during the sentencing hearing leave no room for doubt that the trial court found the existence of enhancement factors (2) previous history of criminal convictions, *see* Tenn. Code Ann. § 40-35-114(2) (2003), and (16) abuse of position of private trust, *id*. § 40-35-114(16), and that no mitigating factors were shown; the trial court also expressly observed that in terms of Range I offender classification, it would not have hesitated to apply and weigh the enhancement factors to arrive at a 12-year sentence.

Given the trial court's remarks, we believe the record is adequate for us to conclude that no basis exists to disturb the defendant's standard, Range I 12-year sentence. The defendant has – and he admitted as much – an extensive criminal record, including convictions for robbery (1992), criminal trespass (1993), possession of explosive components (1994), theft by deception (1995), resisting arrest (1995), unlawful possession of a weapon (1995), and reckless endangerment involving an automobile (1995). The defendant also, without question, abused a position of private trust. *See State v. Turner*, 30 S.W.3d 355 (Tenn. Crim. App. 2000). Last, because the trial court served as the fact finder at trial pursuant to the defendant's waiver of the right to a jury trial, we discern no issues arising from the Supreme Court's opinion in *Blakely v. Washington*, 542 U.S. ___, 124 S. Ct. 2531 (2004).

For the foregoing reasons, we affirm the defendant's conviction and sentence.

_____
JAMES CURWOOD WITT, JR., JUDGE

-13-