# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
March 11, 2014 Session

## STATE OF TENNESSEE v. GLENN CLIMER, JR.

### Appeal from the Circuit Court for Rutherford County
### No. F-67353   David Bragg, Judge

_____

### No. M2013-00651-CCA-R3-CD - Filed June 16, 2014

_____

Appellant, Glenn Climer, Jr., was indicted by the Rutherford County Grand Jury with attempted second degree murder, attempted aggravated child abuse, child abuse, assault, and resisting arrest. Appellant was convicted of attempted voluntary manslaughter, attempted aggravated child abuse, child abuse, assault, and resisting arrest. As a result, he was sentenced to a total effective sentence of twenty-six years, eleven months, and twenty-nine days. After the denial of a motion for new trial, Appellant sought this appeal. On appeal, the following issues are presented for our review: (1) whether the evidence is sufficient to support Appellant's convictions for attempted voluntary manslaughter, attempted aggravated child abuse, and child abuse; (2) whether the trial court erred by allowing counsel for the State to present an improper argument; (3) whether Appellant's conviction for child abuse violates double jeopardy; and (4) whether the trial court properly sentenced Appellant. After a review of the issues raised on appeal, this Court determines that the evidence was sufficient to support the offenses; Appellant waived any issue with regard to improper argument by failing to object at trial; Appellant's convictions do not violate double jeopardy; and the trial court did not abuse its discretion in sentencing Appellant. Consequently, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Trial Court are Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, and NORMA MCGEE OGLE, JJ., joined.

Gerald L. Melton, District Public Defender and Russell N. Perkins, Assistant Public Defender, for the appellant, Glenn Climer, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; William Whitesell, District Attorney General; and Laural A. Hemenway, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Factual Background*

K.C.[1], the victim in this case, was born on October 9, 2010. Appellant is his father. Tiffany Carpenter is the child's mother. On November 28, 2011, Ms. Carpenter and the child were living with Appellant and his mother, Joanne Willis. Ms. Carpenter and Appellant got into a heated argument about whether Appellant was actually the father of the child. Appellant suspected that his brother was the father. Ms. Carpenter did not think that any of Appellant's anger was directed toward the baby but thought that in order to make the situation go away, she should remove herself from the residence. She left the baby in the care of Appellant's mother and locked herself in the bedroom. Appellant tried to get into the bedroom with a knife, but Ms. Carpenter escaped through a window. When she left the house, K.C. did not have any bruises or a black eye. However, Ms. Carpenter stated that the day before she left, the baby fell from the bed to the carpeted floor.

After Ms. Carpenter left the residence, Mrs. Willis had a panic attack. Someone called an ambulance, and Mrs. Willis was transported to the hospital. Lark Willis, Appellant's stepfather, followed the ambulance. He was accompanied by Appellant and the baby. Mr. Willis checked on his wife when he arrived at the hospital. Then, Mr. Willis walked outside. He was stopped by a security guard who asked him to come to the parking lot.

At some point after Appellant arrived at the hospital with his child and his stepfather, someone reported a suspicious-acting male in the parking lot. Police were called. The suspect was later identified as Appellant. Appellant was located by George Alan Dyer, a security supervisor at the hospital. Mr. Dyer saw Appellant trying to open the passenger door of someone else's car. He had a "really shocked look on his face." Appellant was holding a baby. Mr. Dyer approached Appellant and asked him why he was trying to gain access to other people's vehicles. Appellant would not answer and appeared to be "very angry."

---

[1]It is the policy of this Court to refer to minor victims of abuse by their initials.

At that time, Mr. Dyer offered to help Appellant. He even offered to let Appellant and the baby sit in his car to get them out of the cold and rain. A shuttle driver in a golf cart approached the scene, pulling close to Mr. Dyer's vehicle. As the shuttle driver got out, Appellant made a "bee line" for the driver, moving so quickly that he almost dropped the baby he was carrying. Mr. Dyer yelled at Appellant because he was fearful that he was about to attack the shuttle driver. Mr. Dyer finally convinced Appellant to get into his vehicle. Appellant seemed to calm down for a minute. Mr. Dyer used this opportunity to call for backup. He was concerned that Appellant would get "riled up again." Mr. Dyer and others noticed that the baby had a "bruise under its left eye."

Timmy Clardy, another security officer at Middle Tennessee Medical Center, arrived on the scene. He also tried to get Appellant to talk to him. During the conversation, "[Appellant] grabbed the child by the top of the head, the crown of the head . . . and lifted him up." Appellant finally put the child down after being asked several times to do so.

Police arrived on the scene, including Officer David Harrison and Officer Robert Edwards. The officers got into the car with Appellant. After talking to the officers for a few minutes, Appellant started yelling. Appellant "grabbed the child's arm . . . [and] [h]ad the child's chin with his right hand and was pulling [the child's head] towards the child's right shoulder," essentially twisting the child's neck. At one point, Appellant said "look what this bitch [the child's mother] done to his face." Officer Harrison stated that Appellant was "holding the child aggressively . . . at one time he had the baby by the neck. Another time he had him by the top of the head." An officer explained that Appellant did not carry the child like you would carry a baby. He "was slinging him around." Officer Edwards described Appellant's behavior as follows:

> [H]e really didn't say anything except for when I got through talking to him about taking the baby to the hospital and getting it checked out, that's when he stated to me that if it's going to be like that - and that's when he grabbed the baby. And when he grabbed the baby - of course, he had the firm grip on it again. But he grabbed the baby right here and started wrenching its neck. . . . I remember him having his left hand right here around the baby's throat. . . . [A]t that point I come to the conclusion that I thought about if I had to shoot him or not if he did that one more time. That crossed my mind. Of course, I hollered at Officer Harrison and told him to come over here, we're going to have to get this baby away right now. He's trying to hurt the baby.

Multiple people told Appellant to let go of the child. Appellant refused. Appellant told Mr. Dyer to do what he "had to do." Mr. Dyer hit Appellant in the neck; Mr. Clardy rushed Appellant and grabbed him. These actions loosened Appellant's grip around the child

enough that another officer could get the child out of the car. The baby was handed to his grandfather, who was standing in the parking lot.

Appellant was very strong. It took at least three people to handcuff him. During the struggle, Appellant bent Officer Harrison's thumb back around until it touched his arm. Mr. Dyer and Mr. Clardy believed that Appellant intended to either hurt or kill the child. Officer Edwards stated that it was the closest he had ever come in his law enforcement career to shooting someone.

K.C. was taken to the emergency room after the incident. He was seen initially by Jeffrey Lindquist, a physician's assistant at the hospital. The infant was brought in with a verbal report of a possible head injury. A nurse was holding the baby, who was sleeping and appeared comfortable. "Except for the bruising around his eye, there was really nothing remarkable about him." A head CT scan and "skeletal survey" x-ray were ordered based purely on the information gleaned from witnesses. There was bruising of the soft tissue on the baby's left cheek, but doctors wanted to rule out serious head trauma or cervical spine injury. The scans and imaging did not show anything other than bruising and swelling around the eye.

Kevin Smith, an investigator with the Department of Children's Services ("DCS"), was assigned a referral that alleged abuse. Mr. Smith went to the emergency room. He witnessed a bruise under K.C.'s left eye and a bruise extending up toward the forehead on the left side of the eye. Mr. Smith performed several interviews in correlation with his investigation before leaving the victim in the care of hospital staff. K.C. was taken into custody by a DCS social services employee.

As a result of Mr. Smith's investigation, Matthew Wright, the Assistant General Counsel for the Department of Children's Services in Rutherford County, filed a civil petition against Appellant alleging that the child was dependent and neglected. Appellant sent a letter to Mr. Wright in response to the petition. Appellant's five page letter recounted the events of November 27, 2011. Appellant claimed that it was K.C.'s mother, Ms. Carpenter, who allowed the child to fall off the bed and hit his eye on a toy. Appellant stated in the letter that he took the child to the hospital because his mother was having a panic attack. He decided while there to have a doctor look at the child's eye. According to Appellant, he exited the hospital to get the insurance paperwork out of the car when he was stopped by security. After a series of exchanges between security personnel and Appellant, the police arrived. Appellant claimed that the police and security officers beat him up and took him to jail. Appellant denied being responsible for the child's injuries.

As a result of the investigation, Appellant was indicted by the Rutherford County Grand Jury for attempted second degree murder, attempted aggravated child abuse, child abuse, assault, and resisting arrest. At the conclusion of the jury trial, Appellant was convicted of attempted voluntary manslaughter as a lesser included offense of attempted second degree murder, attempted aggravated child abuse, child abuse, assault, and resisting arrest. The trial court sentenced Appellant to a total effective sentence of twenty-six years, eleven months, and twenty-nine days. Specifically, Appellant received a twenty-six year sentence as a Range III, Persistent Offender for attempted voluntary manslaughter. This charge merged into Count Two, attempted aggravated child abuse. Appellant received a sentence of twenty-six years as a Persistent Offender for attempted aggravated child abuse, to be served consecutively to "convictions in Woodbury F-11-84." The trial court sentenced Appellant as a Persistent Offender to four years for the child abuse conviction. Finally, Appellant was sentenced to eleven months and twenty-nine days for the assault conviction, to be served consecutively to the attempted aggravated child abuse conviction and the "convictions in Woodbury F-11-84."

After the denial of a motion for new trial, Appellant sought this appeal. On appeal, the following issues are presented for our review: (1) whether the evidence is sufficient to support Appellant's convictions for attempted voluntary manslaughter, attempted aggravated child abuse, and child abuse; (2) whether the trial court erred by allowing counsel for the State to present an improper argument; (3) whether Appellant's conviction for child abuse violates double jeopardy; and (4) whether the trial court properly sentenced Appellant.

*Analysis*

*I. Sufficiency of the Evidence*

As stated above, Appellant was convicted of attempted aggravated child abuse of a child under eight years of age, attempted voluntary manslaughter as a lesser included offense of attempted second degree murder, child abuse, and assault. Appellant challenges the sufficiency of the evidence with regard to the convictions for attempted voluntary manslaughter, attempted aggravated child abuse, and child abuse. Specifically, Appellant argues that his conduct did not satisfy the requirements of Tennessee Code Annotated section 39-12-101(b). In other words, that his conduct was not "corroborative of the intent to commit the offenses." In conjunction with his argument about sufficiency of the evidence, Appellant also insists that his child abuse conviction should be vacated on double jeopardy grounds because he was also convicted of attempted aggravated child abuse. The State disagrees.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994) (citing *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992)). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id.* The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Harris*, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

"Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a). The existence of adequate provocation is a question of fact for the jury to determine. *State v. Johnson*, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995). Aggravated child abuse occurs when a person commits child abuse, as defined in Tennessee Code Annotated section 39-15-401(a) and the "act of abuse . . . results in serious bodily injury to the child[.]" T.C.A § 39-15-402(a)(1). Child abuse occurs when a person knowingly treats a child under eighteen years of age "in such a manner as to inflict injury[.]" *Id.* § 39-15-401(a). Because the victim herein was under eight years of age, Appellant faced enhanced penalties.

Our supreme court has held that child abuse is a "nature-of-conduct" offense and that, "[a]s such, the prosecution need not prove that the defendant 'intended' to cause injury to the child." *State v. Toliver*, 117 S.W.3d 216, 230 (Tenn. 2003). However, the State must show that the defendant was "aware of the nature of the conduct" when he treated the victim "in

such a manner as to inflict injury." T.C.A. §§ 39-11-302(b), 39-15-401(a); *State v. Hanson*, 279 S.W.3d 265, 277 (Tenn. 2009). Finally, because Appellant herein was convicted of attempted aggravated child abuse, we note that our criminal attempt statute states as follows:

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
>
> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.
>
> (b) Conduct does not constitute a substantial step under subdivision (a)(3), unless the person's entire course of action is corroborative of the intent to commit the offense.
>
> (c) It is no defense to prosecution for criminal attempt that the offense attempted was actually committed.

T.C.A. § 39-12-101.

Viewing the evidence in a light most favorable to the State, the proof shows that hospital staff received reports of a man behaving bizarrely in the parking lot at the hospital. When located by hospital security, Appellant was carrying his child in the parking lot. The child had a bruise on its eye. Appellant aggressively handled the thirteen-month-old child, at one point, picking the child up by the crown of his head. Hospital security staff was so alarmed by Appellant's behavior that they called police. Appellant refused to allow anyone to take the child to the emergency room to have the bruise examined. According to witnesses, Appellant became increasingly agitated. Appellant held the infant by the throat, by the top of the head, and was "slinging" the child around. Officer Edwards even contemplated shooting Appellant because he was afraid he was "going to hurt that baby bad." More than one witness felt that the child's life was in danger. From these facts, we

determine that a rational jury could conclude that Appellant was acting with the intent to cause serious bodily injury to the child. By grabbing the infant's neck and twisting his head, Appellant took a substantial step toward inflicting serious bodily injury and satisfied the requirements of attempted aggravated child abuse.

Looking at the evidence, we determine that the jury could conclude that Appellant would have caused serious bodily injury had officers not been successful in taking the child from Appellant. Additionally, there was evidence to show that K.C. had a bruise and soft tissue injury around his eye, supporting the conviction for child abuse. From the jury verdict, it is clear that the jury rejected Appellant's claim that the bruise was the result of an accidental fall from the bed that occurred prior to the hospital visit. The bruise was seen prior to the incident by security personnel, but no family members testified that the bruise existed prior to the arrival of the child at the hospital. We conclude that the proof is ample to support the convictions for both attempted aggravated child abuse and child abuse. This issue is without merit.

Appellant also challenges his attempted voluntary manslaughter conviction despite failing to provide argument on this issue. We determine that this issue is waived. Tenn. Ct. Crim. App. R. 10(b). Additionally, at sentencing, the trial court merged this offense into the conviction for attempted aggravated child abuse.

## *II. Double Jeopardy*

Next, Appellant argues that his conviction for child abuse violates double jeopardy. Citing *State v. Marcos Acosta Raymundo a.k.a. Marcos Raymundo Acosta*, No. M2009-00726-CCA-R3-CD, 2010 WL 4540207 (Tenn. Crim. App., at Nashville, Nov. 10, 2010), he argues that his conviction for child abuse is barred by double jeopardy because the convictions refer to the same instance of conduct and the child abuse conviction did not require any additional proof beyond that which was required for a conviction for aggravated child abuse. The State insists that there is no double jeopardy violation.

To determine whether multiple convictions are permitted, this Court must: (1) conduct an analysis of the statutory offenses pursuant to *Blockburger v. United States*, 284 U.S. 299,(1932); (2) analyze the evidence used to prove the offenses; (3) consider whether there were multiple victims or discrete acts; and (4) compare the purposes of the respective statutes. *State v. Denton*, 938 S.W.2d 373, 381 (Tenn. 1996). In *State v. Hayes*, 7 S.W.3d 52 (Tenn. Crim. App. 1999), this Court explained that the first step in deciding whether double jeopardy prevents more than one punishment focuses on whether the offenses are the same under the *Blockburger* case analysis. *Hayes*, 7 S.W.3d at 55.

Appellant correctly notes that child abuse is a lesser included offense of the completed offense of aggravated child abuse. *See State v. Hanson*, 279 S.W.3d 265, 268 (Tenn. 2009). In the case herein, Appellant was convicted of attempted aggravated child abuse, specifically for the actions in holding and twisting the head and neck of K.C. The child abuse charge, however, was based on the child's facial bruise. Double jeopardy is only implicated when two convictions "refer to the same instance of conduct." *Marcus Acosta Raymundo*, 2010 WL 4540207, at \*18. The convictions herein are based on two separate and distinct acts, therefore, there can be no double jeopardy violation. Appellant is not entitled to relief. This issue is without merit.

### *III. Improper Argument*

Next, Appellant argues that the trial court erred by allowing the prosecutor to engage in improper argument. Appellant suggests that the effect of the prosecutor's arguments warrant the granting of a new trial. Specifically, Appellant complains about multiple instances of what he claims are prosecutorial misconduct and insist that they violate *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003). The State contends that Appellant's failure to make contemporaneous objections and failure to raise the issue in a motion for new trial results in a waiver of the issue.

We agree with the State. Appellant did not object to any of the allegedly improper statements challenged on appeal during closing arguments. *See* Tenn. R. App. P. 36(a); *State v. Robinson*, 146 S.W.3d 469, 518-19 (Tenn. 2004) (holding waiver applies when defendant fails to contemporaneously object to prosecutor's closing arguments when made). Further, he failed to raise these issues in a motion for new trial. Failure to raise an issue of error, other than sufficiency of the evidence or sentencing, in a motion for a new trial waives that issue for purposes of appellate review.[2] *See* Tenn. R. App. P. 3(e). Appellant is not entitled to relief on this issue.

### *IV. Sentencing*

Appellant challenges his sentence. Specifically, he argues that the trial court "used enhancement factors contained in T.C.A. § 40-35-114(3), (10), and (11). Appellant contends that factor (3), that the offense involved more than one victim, was not appropriate where

---

[2]Appellant objected to one instance of allegedly improper argument at trial. Specifically, this objection related to the prosecutor's statement that "those officers told the truth when they said . . . ." Appellant objected that the prosecutor was improperly "vouching" for the officers's veracity. Appellant included this instance of allegedly improper argument in his motion for new trial. However, Appellant neglected to include any argument with respect to this statement in his brief on appeal. Therefore, we determine that it is also waived.

there were separate convictions for each victim. Additionally, Appellant insists that factor (10) was not appropriate because high risk to human life is an "essential element" of the conviction. Finally, Appellant insists that because there was no proof the prior felony had a "result" of death or serious bodily injury, factor (11) should not apply. The State agrees that the trial court improperly applied factor (3) because there were separate convictions for each victim and factor (11) because "there was no proof that any of [Appellant's] prior violent felonies resulted in death or serious bodily injury." The State also argues that the trial court's application of factor (10) was limited to the determination that Appellant was a dangerous offender in order to support consecutive sentencing. The State concludes that the trial court did not abuse its discretion.

Appellate review of sentencing decisions is now based on an abuse of discretion standard. This Court must apply "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, first determines the range of sentence and then determines the specific sentence and the appropriate combination of sentencing alternatives by considering: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts regarding sentences for similar offenses; (7) any statements the defendant wishes to make in the defendant's behalf about sentencing; and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-210(a), (b), -103(5); *State v. Williams*, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

The trial court is still required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. *See Bise*, 380 S.W.3d at 706 n.41; *State v. Samuels*, 44 S.W.3d 489, 492 (Tenn. 2001). Thus, a sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute.

The trial court herein found that Appellant was a Range III, Persistent Offender on the basis of his prior convictions, including a combination of five or more prior felony convictions within the conviction class or higher or within the next two lower conviction

-10-

classes. The trial court found that several enhancement factors applied: (1) "[t]he defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range"; (3) "[t]he offense involved more than one victim"; (11) "[t]he felony . . . involved the threat of death or serious bodily injury, to another person, and the defendant has previously been convicted of a felony that resulted in death or serious bodily injury"; (13) "[a]t the time the felony was committed. . . [Appellant was]: (C) Released on probation"; and (16) "[Appellant] was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult." T.C.A. § 40-35-114(1), (3), (11), (13), and (16).

After a review of the transcript from the sentencing hearing and the written order entered by the trial court, it is clear that the trial court considered the nature and characteristics of the criminal conduct involved, Appellant's history and background, the mitigating and enhancement factors, and the principles of sentencing. We agree with Appellant and the State that the trial court improperly applied enhancement factors (3) and (11). However, the record supports the trial court's application of enhancement factors (1), (13), and (16). We conclude that the trial court properly applied the principles and purposes of the Sentencing Act. *See Bise*, 380 S.W.3d at 707. The trial court did not abuse its discretion in determining the length of each sentence.[3] Appellant is not entitled to relief on this issue.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
JERRY L. SMITH, JUDGE

---

[3]Appellant does not challenge the imposition of consecutive sentencing on appeal.