IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 7, 2015

## STATE OF TENNESSEE v. MICHAEL RICHARDSON

**Appeal from the Criminal Court for Shelby County**
**No. 13-02996     J. Robert Carter, Jr., Judge**

_____

**No. W2014-01053-CCA-R3-CD  -  Filed October 16, 2015**

_____

The Defendant, Michael Richardson, was indicted for one count of aggravated rape and one count of aggravated robbery.  <u>See</u> Tenn. Code Ann. § 39-13-402, -502.  Following a jury trial, the Defendant was convicted of aggravated rape.  The jury was unable to reach a verdict on the aggravated robbery charge, a mistrial was declared with respect to that charge, and it was ultimately dismissed.  The trial court sentenced the Defendant as a Range I, standard offender to twenty-two years for the aggravated rape conviction to be served at one hundred percent.  On appeal, the Defendant contends that the trial court erred "in ruling that if consent [was] raised as a defense," then evidence of two other rapes committed by the Defendant "would be relevant to rebut the issue of consent."  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and JOHN EVERETT WILLIAMS, J., joined.

Jeff Woods, Memphis, Tennessee, for the appellant, Michael Richardson.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; Eric Christensen and Katherine Berendt Ratton, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### FACTUAL BACKGROUND[1]

_____

[1] This section will discuss the factual background of the Defendant's conviction.  The factual background regarding the Defendant's evidentiary issue will be discussed in the Analysis section of this opinion.

The victim, E.E.,[2] testified that on August 4, 2012, she was leaving work between 8:00 and 9:00 p.m. when a friend approached her. E.E.'s friend asked her if a woman who had passed out in his car could stay the night at E.E.'s house. E.E. rode to her house in her friend's car with him and the woman. As they were driving to her house, E.E. noticed a white car following them. E.E. assumed that the driver of the white car was a friend of the unconscious woman.

When they arrived at E.E.'s house, her friend carried the woman inside and a man, whom E.E. identified as the Defendant, got out of the white car and asked if she needed "some help." E.E. told the Defendant that she was "fine" and went into her house to check on her friend and the woman. E.E. testified that after her friend left, she decided to go to the store because she "wanted to have a little beer or something." The Defendant was still parked in front of her house and offered her a ride to the store. E.E. testified that she accepted and got in the Defendant's car.

E.E. testified that she thought the Defendant would take her to a nearby store but instead he drove her to the highway and started speeding. As the Defendant drove onto the highway, he said, "Shut up, b---h; suck my d--k or I'll kill you." The Defendant took his penis out and "grabbed [her] head with his other arm and made [her] go down on him and suck his d--k." E.E. testified that she complied because she was afraid; the Defendant had threatened to kill her and was "speeding up as fast as he [could] go." But after a minute or two, the Defendant "got pissed off because [she] wasn't doing it right."

Eventually, the Defendant got off the highway and parked the car in a secluded, rural area. The Defendant got out of the car and came around to the passenger side. He instructed the victim to take off her underwear, and "he opened up [her] legs." E.E. testified that she "started hollering an[d] screaming and begging him not to do it" as the Defendant penetrated her vagina with his penis. E.E. also testified that she tried to fight the Defendant off but that he was "bigger than [her], so there [was] nothing [she] could do."

E.E. testified that as she fought the Defendant, he "was holding [her] down and roughing [her] up and pushing [her]." E.E. continued to try to push the Defendant off of her as he raped her. E.E. put her hands on the Defendant's face "to try to pull his eyes out." As she did this, the Defendant bit one of her fingers "like an animal biting your finger off." At some point during the attack, the Defendant took twenty-seven dollars E.E. had kept in her bra.

After the Defendant ejaculated into E.E.'s vagina, he got back into the driver's seat and said, "Now, get out of my car, b---h." The Defendant abandoned E.E. "in the

_____

[2] It is the policy of this court to refer to victims of sexual offenses by their initials.

middle of nowhere in a [dark] wooded area." E.E. testified that she walked for a long time until she found some houses. She knocked on several doors, but no one answered. E.E. kept "walking down the road" until she was discovered by a police officer. E.E. testified that there was a "whole piece [of her finger] hanging" off from the Defendant's bite and that it took "about eight" stitches to reattach the tip of her finger. E.E. further testified that she still did not "have any feeling" in that finger because the bite "damaged the nerve."

On cross-examination, E.E. was asked if it struck her "as unusual" for a stranger to offer her a ride or "to go out and have a drink." E.E. testified that it did not. E.E. also denied that she and the Defendant had ever "discussed going out on a date." E.E. admitted that she had "a couple of drinks [earlier] that day" and that she took medication for depression, but she denied that she was under the influence of any narcotics that night. E.E. was asked if she recalled seeing the Defendant with a weapon that night, and she testified that she did not.

Defense counsel then asked why E.E. complied with the Defendant's demand for oral sex if "he didn't force you to do that – there was no weapon displayed," and she was asked what she was wearing that night. E.E. testified that she thought she was wearing a dress that night but that she was not certain. E.E. also admitted that she had a prior conviction for theft of property. On redirect examination, E.E. testified that she "didn't want to have oral sex with" the Defendant and that she only did so after he threatened to kill her.

Deputy Derek Jordan of the Shelby County Sheriff's Office (SCSO) testified that around 5:00 a.m. on August 5, 2012, he responded to "a suspicious person call." Deputy Jordan found E.E. walking down a dark area of Highway 70, which had little to no traffic that time of day. Deputy Jordan recalled that E.E. appeared "to be very shook up, frightened," and injured. Deputy Jordan testified that E.E. "had a deep gash on . . . her ring finger," "her jaw was swollen," and "[h]er lip was kind of puffy." Deputy Jordan recalled that E.E. was "frantic" when she spoke to him and that she "was real nervous and scared." E.E. told Deputy Jordan "that she had been raped." Deputy Jordan went with E.E. to the hospital and photographed her injuries. Deputy Jordan recalled that E.E. needed eleven stitches to reattach the tip of her finger.

Glenda Moses, Ph.D., testified as an expert in forensic nursing. Dr. Moses testified that she was a nurse practitioner and that she worked for the Shelby County Rape Crisis Center. Dr. Moses examined E.E. on the morning of August 5, 2012, at Saint Francis Hospital – Bartlett. Dr. Moses testified that she performed oral and vaginal "swabs" on E.E. in an effort to collect DNA evidence. Subsequent forensic testing by the Tennessee Bureau of Investigation (TBI) revealed the presence of semen on both the oral

and vaginal swabs. A DNA profile was generated from the vaginal swab and was a match for the Defendant's DNA.

Dr. Moses testified that E.E. "complained of jaw pain, left neck pain, and . . . that her lips hurt." According to Dr. Moses, the inner part of E.E.'s left upper and lower lips were bruised. Dr. Moses opined that the bruises were consistent with being hit in the face. Dr. Moses also noted that E.E. had an injury to her right ring finger. Dr. Moses testified that the victim's vagina was "basically normal" but that it was not unusual for female rape victims to "not necessarily have injuries" to their vaginas.

Lieutenant Kevin Helms of the SCSO testified that he assisted in an interview with the Defendant about this case on November 20, 2012. Portions of the Defendant's interview were played for the jury at trial. The Defendant repeatedly denied knowing or having ever seen the victim. The Defendant also repeatedly denied biting the victim's finger or ever biting anyone like that. When confronted by Lt. Helms with the fact that his DNA was found on the vaginal swab, the Defendant stated that he wanted to see the DNA test results.

Based upon the foregoing proof, the jury convicted the Defendant of aggravated rape. It was unable to reach a verdict on the aggravated robbery charge, a mistrial was declared with respect to that charge, and it was ultimately dismissed. In sentencing the Defendant, the trial court gave "great weight" to the Defendant's "significant criminal history" for enhancement purposes and little weight to the fact that the Defendant's wife was present at the sentencing hearing "in support of him" in mitigation. The trial court sentenced the Defendant as a Range I, standard offender to twenty-two years to be served at one hundred percent. This appeal followed.

## ANALYSIS

The Defendant contends that the trial court erred "in ruling that if consent [was] raised as a defense," then evidence of two other rapes committed by him "would be relevant to rebut the issue of consent." The Defendant argues that the trial court abused its discretion because consent was not "a legitimate material issue" other than conduct conforming with a character trait for purposes of admissibility under Tennessee Rule of Evidence 404(b). The Defendant further argues that even if consent raised a material issue, the trial court erred in finding that the probative value of the other rapes outweighed the danger of unfair prejudice. The Defendant also argues that the trial court's ruling was not harmless error because it denied him the opportunity to present a defense and denied him "the right to an effective cross-examination." The State responds that the trial court did not abuse its discretion and "followed the Rule 404(b) procedures exactly."

Prior to trial, the State filed a motion to introduce evidence pursuant to Tennessee Rule of Evidence 404(b) of two other rapes committed by the Defendant in order to establish the Defendant's identity as the perpetrator and a common scheme or plan. The day before the start of the Defendant's jury trial, the trial court held a jury-out hearing on this matter. At the hearing, the State presented the testimony of E.E., the two other victims, and TBI forensic scientist Lawrence James.

The first victim, D.C., testified that on July 6, 2012, she was walking down Summer Avenue around 8:00 or 9:00 p.m. when she was approached by two men in a blue car. D.C. testified that the men "seemed real nice" and offered her a ride home because it was "too hot" outside for her to be walking home. D.C. accepted their offer, but they drove past her home. D.C. recalled that one of the men was "real big," and the other was smaller.

After they drove past her home, the smaller man got in the backseat and forced D.C. to perform fellatio on him. D.C. testified that the man shoved her "head down there" and hit her "numerous times" when she resisted. The man called her a "b---h," told her to do what he told her, and took pictures and video with his cell phone of D.C. performing fellatio on him.

D.C. recalled that the large man "drove and drove and drove" until they arrived at a field. The men made D.C. get out of the car and perform fellatio on the large man while the smaller man penetrated her vagina. D.C. testified that the smaller man did not use a condom. D.C. further testified that, when she resisted, the men hit her. After the smaller man ejaculated, they left D.C. in the field, and the smaller man said she was "lucky [they did not] slice [her] to death and throw" her body in a ditch. D.C. recalled that it was around 1:00 a.m. when the men left.

The second victim, B.H.S., testified that on October 18, 2012, she was walking down Summer Avenue when she was approached by a man in a car. B.H.S. testified that the man offered her marijuana, but she declined and asked him to buy her a beer instead. The man drove B.H.S. to a gas station where he purchased her a beer. The man offered to "buy [B.H.S.] some more beer," and they drove away from the gas station.

B.H.S. testified that the man started speeding and demanded her to perform fellatio on him. B.H.S. further testified that she could not remember if she performed fellatio on the man but that she remembered "putting [her] mouth close to his private" and she "might have put [her] mouth on it." The man "wanted to drive around and do it."

The man eventually stopped in a wooded area and forced B.H.S. to allow him to penetrate her vagina with his penis. When he finished, the man told her to get out of his car and left her in the woods. B.H.S. testified that she did not want to have sex with the

man but that he had threatened to "blow [her] brains out" and she "was fearing for [her] life."

E.E.'s testimony at the 404(b) hearing was consistent with her trial testimony. TBI Special Agent James testified that he examined the "rape kits" for all three victims. Agent James testified that he found semen on oral and vaginal swabs taken from D.C. and that the Defendant's DNA was the major contributor for the semen from the vaginal swab. Agent James also testified that the Defendant's DNA was present on the vaginal swabs from both B.H.S. and E.E.

At the conclusion of the hearing, the trial court found that the proof of the rapes of D.C. and B.H.S. was clear and convincing. The trial court then concluded that the identity of the perpetrator was not a material issue in light of the DNA evidence. With respect to the State's argument that evidence of the two other rapes was material to establish a common scheme or plan, the trial court concluded that, while the offenses were strikingly similar, they did not evidence a distinct design or unique method.

While not stated by the trial court, we also note that "identity is usually the only relevant issue supporting admission of other offenses when the theory of common scheme or plan is grounded upon a signature crime"; therefore, the fact that identity was not a material issue in light of the DNA evidence would also prevent admission of the other rapes for purposes of establishing a common scheme or plan. State v. Moore, 6 S.W.3d 235, 239 (Tenn. 1999).

The trial court then stated that it was "taking [the] matter under advisement for the time being." The trial court cautioned that it would "find that if consent [was] raised as a defense in this issue, that the proof of these other two crimes would be relevant to rebut that consent." The trial court ordered the State to make no mention of the other rapes during its direct proof but stated that the State could "revisit this again" at the close of its proof. The trial court stated that if it found "the tenor of cross-examination [made] those other two crimes . . . relevant, then [it would] allow [the State] to put the proof on." The trial court also stated that if the Defendant raised the issue of consent during his proof, he would allow the State to introduce evidence of the other rapes in rebuttal.

The Defendant made no objection to the trial court's ruling at that time. At the start of the first day of the trial, defense counsel objected to the trial court's ruling stating that it took "away any kind of defense, whatsoever." The trial court disagreed "one hundred percent" and stated that evidence of the other rapes "would be relevant to whether or not it was consensual in this case if [the Defendant] were to say that it [was]" for the limited purpose of showing "absence of mistake." The trial court then stated that the Defendant did not "get to have three cases pending and then try them in a vacuum because he thinks that his behavior in another case . . . is damaging."

At the conclusion of E.E.'s testimony, the State argued that defense counsel asked "some questions toward consent" and asked the trial court to allow it to introduce evidence of the other rapes during its case-in-chief. The trial court stated that given the proof at that time, it did not think it "would charge a consent defense" and denied the State's request. Defense counsel complained that there were "very few things [he] could ask because it [would open] up that door."

At the conclusion of Dr. Moses's testimony, defense counsel again objected to the trial court's Rule 404(b) ruling and stated that he would not cross-examine Dr. Moses "because the questions that [he] would ask her regarding her findings – regarding condition of clothing, . . . gets into consent." The trial court responded that it was not "telling [him]" that he could not "put on a defense of consent." Rather, the trial court clarified that it had ruled that a defense of consent "could make the prior acts relevant." Later, in discussing the Defendant's decision not to testify at trial, defense counsel stated that if the Defendant had testified, "it would raise the issue of consent."

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that person's actions were in conformity with the character trait. Tenn. R. Evid. 404(b). This rule "is based on the recognition that such evidence easily results in a jury improperly convicting a defendant for his or her bad character or apparent propensity or disposition to commit a crime regardless of the strength of the evidence concerning the offense on trial." State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994) (citing Anderson v. State, 56 S.W.2d 731 (Tenn. 1933)). The danger of a jury improperly convicting a defendant based on his character rather than the evidence presented at trial "particularly exists when the conduct or acts are similar to the crimes on trial." Id. (citing State v. Parton, 694 S.W.2d 299, 303 (Tenn. 1985)).

Accordingly, Rule 404(b) is generally one of exclusion, but exceptions to the rule may occur when the evidence of the otherwise inadmissible conduct is offered to prove the motive, identity, or intent of the defendant; a common scheme or plan; opportunity; or the absence of mistake or accident. State v. Tolliver, 117 S.W.3d 216, 230 (Tenn. 2003); State v. McCary, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). In addition to these exceptions, evidence of other acts may be admitted to provide the jury with necessary contextual background. State v. Gilliland, 22 S.W.3d 266, 272 (Tenn. 2000); see also Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[13] (6th ed. 2011) (stating that such evidence is admissible to tell the "complete story").

Rule 404(b) requires the court to hold a jury-out hearing regarding the admissibility of specific instances of conduct "upon request." Tenn. R. Evid. 404(b)(1). In order to determine the admissibility of other bad acts, the trial court must consider the following three elements: (1) whether a material issue other than conduct conforming with a character trait exists supporting admission of the other act; (2) whether proof of

the other act is clear and convincing; and (3) whether the probative value of the evidence is not outweighed by the danger of unfair prejudice. Tenn. R. Evid. 404(b)(2)-(4). If these three thresholds are met, the evidence may be admitted. We review a trial court's ruling on Rule 404(b) evidence for an abuse of discretion, provided that the trial court has substantially complied with the procedural prerequisites of the rule. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

Here, the trial court substantially complied with the procedural prerequisites of Rule 404(b); therefore, we examine the trial court's decision for an abuse of discretion. An abuse of discretion occurs "when the trial court has applied an incorrect legal standard, or has reached a decision which is illogical or unreasonable and causes an injustice to the party complaining." State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006). At the outset, we agree with the trial court's conclusion that the proof of the other rapes was clear and convincing.

The majority of the Defendant's argument on appeal centers on whether a defense of consent would have created a material issue to support the admission of the other rapes. Our supreme court has explicitly declined to recognize a general "sex crimes" exception to Rule 404(b). Rickman, 876 S.W.2d at 828-29. Instead, "evidence of [other] sexual misconduct is governed by the same evidentiary rules as evidence of other non-sexual misconduct." Id. at 829. The trial court was correct that identity was not a material issue in light of the DNA evidence connecting the Defendant to the offense and E.E.'s testimony at trial identifying the Defendant as her attacker.

Here it is important to note that the Defendant does not take issue with the trial court's exclusion of the evidence of the other rapes. Instead, the Defendant argues this issue as if the trial court's statements cautioning him that a defense of consent could "open the door" to allow for evidence regarding the other rapes was tantamount to a ruling excluding such a defense. "[F]or an appellate court to review a record of excluded evidence, it is fundamental that such evidence be placed in the record in some manner." State v. Goad, 707 S.W.2d 846, 852 (Tenn. 1986). When, as is the case here, the alleged excluded evidence "consists of oral testimony, it is essential that a proper offer of proof be made in order that the appellate court can determine whether or not exclusion was reversible." Id. at 853.

The Defendant made no such offer of proof. We have only defense counsel's statement that the Defendant's testimony "would raise the issue of consent." Nor is the substance of the Defendant's proposed consent defense apparent from the record given the victim's testimony that the entire sexual encounter was violent and nonconsensual and the Defendant's repeated denials to Lt. Helms of ever having met the victim. See Tenn. R. Evid. 103(a)(2) (stating that error "may not be predicated upon a ruling which . .

. excludes evidence unless" an offer of proof was made or "the substance of the evidence" was "apparent from the context").

It is impossible for us to make a determination of whether a defense of consent would have raised a material issue because the Defendant failed to make an offer of proof regarding the issue of consent. Likewise, we cannot evaluate whether the probative value of the evidence of the other rapes was outweighed by the danger of unfair prejudice. Accordingly, we conclude that the Defendant has waived this issue by failing to make a proper offer of proof.

Nevertheless, with respect to the Defendant's argument that the trial court's ruling prevented him from presenting the defense of consent and effectively cross-examining the State's witnesses, we note that the trial court did not prohibit the Defendant from doing either. In fact, the trial court specifically told defense counsel that this was not the case. Rather, defense counsel made the strategic decision to forgo pursuing a defense of consent and cross-examining the witnesses on that particular subject in order to avoid "opening the door" to more damaging evidence. Such a strategic decision does not violate a defendant's constitutional rights to a defense or to cross-examine that State's witnesses. See Bailey v. Pitcher, 86 Fed. Appx. 110, 114 (6th Cir. 2004) (holding the same with respect to a defendant's right to cross-examine witnesses under the Confrontation Clause). As such, this argument is without merit.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-9-